[Crim. Nos. 11725, 11727. Fourth Dist., Div. One. May 24, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ELIAS MARTINEZ, Defendant and Appellant.

122

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Victoria Sleeth, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WIENER, J.—John Elias Martinez appeals the judgment entered following his conviction on two counts of robbery (Pen. Code, § 211)[1] and

[1] All statutory references are to the Penal Code unless otherwise specified.

a true finding of the armed allegation in reference to each count (§ 12022, subd. (a)).[2] Relying upon section 1111,[3] Martinez contends his motion for judgment of acquittal (§ 1118)[4] should have been granted because there was insufficient evidence before the court at the time the motion was made to support the convictions and true findings. As we shall explain, we have concluded his argument is valid and we therefore reverse the judgment with directions to the trial court to enter a judgment of acquittal.[5]

I

An information filed November 14, 1979, charged Martinez with 10 counts of robbery and being armed in each robbery within the meaning of section 12022, subdivision (a). Counts one through five involved five different victims in a single transaction which occurred on December 14, 1978. The balance of the counts involved five additional victims in another transaction which occurred two days earlier, December 12, 1978. At the close of all the evidence and before argument, the court

---

[2]On appellant's motion, we consolidated this appeal with Martinez' appeal from the judgment of conviction of burglary, case No. CR 48564 referred to *post*, page 134, as the San Diego case.

[3]Section 1111 provides in pertinent part: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

[4]Section 1118 reads: "In a case tried by the court without a jury ... the court on motion of the defendant or on its own motion shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading after the evidence of the prosecution has been closed if the court, upon weighing the evidence then before it, finds the defendant not guilty of such offense or offenses. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

[5]For a number of reasons, this case illustrates the limited, and on occasion, admittedly frustrating role of the intermediate appellate court. We are squeezed here by a scanty factual record (see *post*, p. 124) and governed by precedent restricting our interpretation of the required form and content of a section 1118 motion, and the permissible methodology for determining whether there is sufficient corroboration of an accomplice's testimony under section 1111. (See *People v. Belton* (1979) 23 Cal.3d 516 [153 Cal.Rptr. 195, 591 P.2d 485]; *People v. Tewksbury* (1976) 15 Cal.3d 953 [127 Cal.Rptr. 135, 544 P.2d 1335] and *People v. Szeto* (1981) 29 Cal.3d 20 [171 Cal.Rptr. 652, 623 P.2d 213].) In hewing to our function, however, we nevertheless believe it proper to respectfully request our high court to reconsider these issues since a modification of these holdings may now be appropriate. (See discussion *post*, at pp. 129 and 132-133, fn. 10.)

granted a judgment of acquittal (§ 1118) on eight counts. (*Sic.*)[6] After argument, the court found Martinez guilty of robbing Inez Olea (count three) and Leonardo Olea (count five) and the armed allegation in each count to be true.

At trial, none of the victims of the December 12 robbery (counts six through ten) could be located. The court refused to admit their testimony from the transcript of the preliminary hearing ruling the People had failed to establish due diligence in attempting to secure the attendance of the missing witnesses. Because of this ruling, the People were able to present only a single victim-witness to the December 14 crimes, 18-year-old Leonardo Olea.

Leonardo testified that in the early morning hours of December 14, he, his brother Inez, and another man were asleep in the bunkhouse at the La Fresa ranch in Vista where they were employed. Three men, two of them with guns, woke them up and demanded money. The robbers took $2 in change from Leonardo's person. He saw the robbers search his brother's pockets and take a piece of paper from him which Leonardo assumed was money although he did not clearly see the bill which was taken. The money was stuffed into a white pillowcase type bag the men were carrying. The three robbers then searched the bunkhouse. Although Leonardo did not see them take anything else, his brother later discovered money was missing.

Leonardo could not see the robbers very well because it was dark; he also was unable to see the type of clothing they were wearing. The robbers would not let the victims see their faces. Leonardo did not remember if they wore hats; but they wore something tied over the lower parts of their faces. When first awakened, one of the men put a flashlight beam into Leonardo's eyes so he would be unable to identify the men at a later time.

Leonardo, however, was able to testify that all three men appeared to be Mexican-American. He believed two of the three were very dark skinned while the third had a lighter complexion and a beard. He was unable to identify Martinez as one of the robbers.

---

[6]For convenience, we have used the same label for this motion as defense counsel did at trial. This label is incorrect, however, for unlike its counterpart, section 1118.1 for use in a jury trial, a section 1118 motion may be made only after the People's case has been completed and *before* the presentation of defense evidence.

Police Officer Burke went to the ranch in response to a radio call about the robbery. Approaching the scene he spotted a green Kawasaki motorcycle parked off the road. About one-half mile beyond the motorcycle, he saw a white 1967 Plymouth Valiant parked at the side of the road. Burke spoke briefly with its occupant, David Brooks Heath, who said he was just "clearing his head." Heath was not detained and left. During his investigation, Burke found a pillowcase stamped "Specialized Linen Rental Service/Rented, Never Sold" on the ground about one-quarter mile from the parked Valiant.

Later, Heath was located, arrested and charged with the robberies. In exchange for his guilty plea to one count and his promise to testify against Martinez, the remaining counts against him were dismissed. At trial, Heath testified in great detail to the events which occurred between December 11 and December 14.

Heath said he first met Martinez at the Tahitian Village Motel in Downey about 7 p.m. on Monday, December 11, 1978. Heath had just arrived from St. Louis and testified he had a personal need for drugs. Also present at the motel were James Anderson and Eddie Marquez. Martinez told the group it was easy to rob alien farmworkers which he had done before because they did not report the crimes to the police. In exchange for drugs, Heath agreed to drive the trio to Vista.

That evening, Heath drove Marquez and Anderson in his 1967 Plymouth Valiant following Martinez, who led the way to the scene of the robbery on his green Kawasaki motorcycle. Anderson and Marquez had on green navy coats and wool navy caps. Martinez wore a green hooded sweatshirt and carried a .25 automatic. On the outskirts of Vista, they stopped at a 7-Eleven store where Anderson bought a flashlight. Heath continued to follow Martinez to the ranches. Martinez then parked his motorcycle, got into the car and they continued to the top of the hill. Here, all but Heath got out of the vehicle. The three men returned in about one-half hour with a plastic bag filled with wallets and money. Heath then drove Martinez to the motorcycle and all returned to a motel. In the motel parking lot, Anderson, Marquez and Martinez divided $230.

The following day, December 12, they remained in their motel room most of the time. At midnight, they went to another ranch using the same mode of transportation. This time Martinez parked his motorcycle at a gas station. When he got into the car he gave Heath directions. At

the ranch, Heath again stayed in the car while the other three left with a .25 automatic, a BB gun resembling a .45 which Anderson had purchased that day, and a pillowcase from the motel which Heath had suggested they bring. After one-half hour they came back with wallets, radios and money in the pillowcase. Back at the motel, Anderson, Marquez and Martinez divided about $1,200.

The third day, Wednesday, December 13, Heath wanted to leave the area and return to Los Angeles. He was persuaded, however, to assist his cohorts in one more robbery. Again, Martinez on his motorcycle led the car to the same general area as the first night. After parking the motorcycle, he entered the car. Heath drove the car for about one-half mile. All but Heath got out. Again they were armed with a .25 automatic and the BB gun resembling the .45 caliber pistol. They also carried a flashlight and the pillowcase.

Thirty to forty-five minutes later, Heath was approached by Officer Burke. When Burke finished questioning him, Heath left. He next saw his confederates where he had first met them, the Tahitian Village Motel, on Friday, December 15. They were angry because he had left them without a getaway car.

Heath identified Martinez at trial, but said he had not known his last name, knowing him only as "John."

Martinez testified on his own behalf. He denied owning a green motorcycle and denied knowing Heath, Anderson or Marquez. When asked at trial (Jan. 23, 1980) whether he robbed anyone near Vista in the late evening or early morning hours of December 13 or 14, 1978, he responded, "Not to my recollection." He stated he was under the influence of drugs during that period of time. He admitted to having been convicted of "approximately three to four felonies," including two burglaries and car theft.

## II

Martinez claims the court erred in denying his section 1118 motion at the close of the prosecution's case in chief because the only evidence at that stage of the proceedings connecting him with the robbery was the testimony of an accomplice, David Heath. He says by not producing any corroboration of the testimony of the accomplice during its case,

the prosecution failed to present a prima facie case and therefore we must reverse.

This argument presents three distinct questions which we must answer. Did the form and content of Martinez' dismissal motion comport with the requirements of section 1118? Is Heath an accomplice? And if so, was there sufficient independent corroboration of his testimony to satisfy the requirements of section 1111? We discuss each separately.

A

At the conclusion of the People's case, Martinez' defense counsel said: "At this point, your Honor, before we place any witnesses upon the stand, we move to dismiss the counts against John Elias Martinez on the grounds there is no direct evidence that he committed any robberies at all. At best, there is circumstantial evidence that he committed such robberies based on the evidence before the Court. There is a direct evidence if one chooses to believe the evidence of Mr. Heath; that he was in receipt of stolen property. But he's not charged with that fact, and as to what the District Attorney wishes to do with that, assuming the Court was to rule in favor of Mr. Martinez, would be mere speculation on my part. I believe, therefore, since the circumstantial evidence rule says if it's capable of being interpreted either in favor or against the defendant and this circumstantial evidence is capable of being interpreted in such way, I think it requires it be interpreted in favor of the defendant.

"In the particular case so far, there has been no direct evidence on the part of the victim that this individual robbed him, and Mr. Heath didn't see him rob anybody, and I would ask, therefore, the Court dismiss the 211's themselves.

"THE COURT: All right. The motion is denied."

█ Conspicuously absent from counsel's statement is any reference to Heath's status as an accomplice. Because of tactical considerations or inadvertence, defense counsel not only seems to have ignored this point, but in directing the court's attention to other considerations, appears to have accomplished just the opposite. █ Instead of asking the court to search the record for corroboration of Heath's testimony as an accomplice, counsel focused upon the admitted validity of that testimony as circumstantial evidence, conceding Martinez may

have been guilty of receiving stolen property but not guilty of robbery.[7]
■ Recognizing the inherent unfairness to this exceedingly conscientious trial judge whose mental set was diverted from the issue which we now address, we must nevertheless conclude that under *People v. Belton, supra*, 23 Cal.3d 516, the motion was procedurally adequate to require the court to determine whether Heath was an accomplice and to search the record for corroboration of his testimony.

In *Belton*, the California Supreme Court explained the history and legislative development of sections 1118 and 1118.1. It stated: "In enacting present sections 1118 and 1118.1, the Legislature provided the defendant with the benefit of a procedure by which to move for acquittal when the prosecution fails to prove a prima facie case. The bill digest prepared by the Senate Judiciary Committee on the legislation proposing these sections recognized the dilemma a defendant faced without a procedure by which to test the sufficiency of the prosecution's evidence in its case-in-chief. The bill digest stated in pertinent part, 'Under present California law, a defendant is not permitted to argue that the prosecution has not made a prima facie case. His alternatives are (1) to rest at the close of the prosecution's case, gambling that the court shares his opinion, or (2) to proceed with presenting his defense. Proponents acknowledge that there will be very few cases wherein the prosecution will not present a triable issue, however state that *it is in these cases that defendant should have the right to terminate the matter at the close of the prosecution's evidence.*' (Italics added.)

"In giving substance to this right, the Legislature provided that a motion to acquit could be made by either the defendant or the trial court, *without any requirement that the motion be made in a particular form.* The Attorney General nevertheless contends that appellant's motion to acquit made pursuant to section 1118 should have included a statement

---

[7]It has been suggested the failure of counsel to orally state this was a section 1118 motion, directing the court to the specific section of the Penal Code, is fatal to his claim. We disagree. Reference to a particular number is not the *sine qua non* of any motion brought in a criminal proceeding provided the court is alerted to the purpose of the motion and the defendant otherwise *satisfies the procedural requirement of the statute.* Here, counsel's statement that he was moving to dismiss the counts against his client *before* presenting any evidence complied with the statute. The fact that counsel later referred to section 1118 to label his motion brought at the conclusion of *all* the evidence here (see *ante*, fn. 6) is of no significance. It appears counsel did no less than what was done in *Belton* where trial counsel stated that he did not "'think that we have sufficient evidence here to convict Mr. Belton of any crime ....'" (23 Cal.3d at p. 521, fn. 6.)

of specific grounds. However, to so construe this section would force a defendant to face the same kind of dilemma from which the Legislature sought to extricate defendants. In effect, a defendant would be forced to choose between: (1) specifying the defects in the prosecution's case, thereby affording the prosecutor an opportunity to seek to reopen the case in order to cure such defects; (2) making no motion and resting, thereby sacrificing his right to present a defense for fear that later evidence might cure the defects in the prosecution's case; or (3) making no motion, thereby waiving the right to challenge the prosecution's case-in-chief, and proceeding to present a defense. Forcing a defendant to elect among these alternatives would deny him the intended protection of the section. Further, to require a defendant to state specific grounds in support of the motion for acquittal would place the burden upon him to point out to the prosecutor, as well as to the court, the gaps in the prosecution's case. Such a requirement would come perilously close to compelling a defendant to aid in his own prosecution and would lessen the prosecutor's burden to prove each and every element of the case beyond a reasonable doubt." (*Id.*, at pp. 521-522, fns. omitted, italics supplied.)

Thus here, regardless of the questionable form of Martinez' motion, under *Belton* it was adequate to require the court to determine whether Heath was an accomplice, and if so, whether there was sufficient evidence to corroborate his testimony.

Before leaving this point, however, we respectfully urge our Supreme Court to reconsider *Belton.*

A major concern in *Belton* was that if a defendant were required to specify the defects in the prosecution's case, the prosecutor would be afforded the opportunity to reopen the case in order to cure the defects. (23 Cal.3d at p. 521.) The thought occurs to us that rather than deprive the trial court of specification of reasons for the motion, a simpler solution, equally fair to the defendant, would be to require the defendant to specify reasons for the motion but deny the People the right to reopen for any reason so specified. In this manner the trial court would be alerted to the issues presented, avoiding *sua sponte* omniscience and the sandbagging effect of a diversionary argument. Obviously there may be other solutions to this difficult problem. Whatever the solution, there should be a better procedural technique to deal with this issue in order to avoid the injustice resulting in this case where the practical effect of

defense counsel's argument was to prohibit trial court consideration of the question so thoroughly briefed and argued in this appeal.

B

Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." This definition includes principals (§ 31) in the criminal act but not accessories (§ 32). (*People* v. *Tewksbury, supra*, 15 Cal.3d 953, 960.) "Whether a person is an accomplice is a question of fact for the [trier of fact] unless there is no dispute as to either the facts or the inferences to be drawn therefrom." (*Ibid.*) ■ The defendant has the "burden of both producing evidence raising [the accomplice] issue and of proving the accomplice status by a preponderance of the evidence." (*People* v. *Belton, supra*, 23 Cal.3d at p. 523, citing *People* v. *Tewksbury, supra*, 15 Cal.3d at pp. 963, 968.) However, when the prosecution introduces evidence during its case in chief which establishes the accomplice status by a preponderance of the evidence, defendant's burden is satisfied. (*People* v. *Belton, supra*, 23 Cal.3d at pp. 523-524.)

The fact that Heath pleaded guilty to one count of robbery after being arrested and charged with the same robberies for which Martinez was tried does not, in and of itself, determine his status as an accomplice. (See *People* v. *Gordon* (1973) 10 Cal.3d 460, 467 [110 Cal.Rptr. 906, 516 P.2d 298].) ■ "Criminal liability as a principal attaches to those who aid in the commission of a crime only if they also share in the criminal intent [citations] or ... abet the crime." (*People* v. *Tewksbury, supra*, 15 Cal.3d at p. 960, fn. omitted.) While Martinez need not have demonstrated that Heath had the specific intent to commit a robbery, at a minimum it must be shown that "prior to its commisssion, [Heath] realized that a robbery was being planned and that [he] was facilitating its commission. [Citations.]" (*Ibid.*) Conceivably, Martinez might be burdened with proving that Heath acted for the *purpose* of aiding Martinez and his cohorts in the commission of a robbery. (See *People* v. *Petty* (1981) 127 Cal.App.3d 255, 263, fn. 2 [179 Cal.Rptr. 413]; *People* v. *Valenzuela* (1982) 130 Cal.App.3d 903, 917-918 [182 Cal.Rptr. 160] (dis. opn. of Wiener, J.); see also *People* v. *Yarber* (1979) 90 Cal.App.3d 895, 916 [153 Cal.Rptr. 875].)

■ Under either substantive standard, however, Heath's actions in this case qualify for accomplice status. It is without dispute that Heath

participated in two completed robberies driving the getaway car both to and from the scene of the crime. Only on the third day did he ponder, for reasons which are not clear, whether he should continue his participation in another robbery. For whatever reason, he voluntarily decided to stick with his companions, testifying he drove the men to the scene on this third occasion, knowing they were going there again to commit a robbery. It is only after he was approached and questioned by the police that he decided to withdraw. Thus, this record categorically establishes Heath as a wheelman who willingly drove his confederates to an inaccessible location for the purpose of committing robberies, deciding to flee in the getaway car on the third occasion only after he was questioned by the police. To suggest that Heath manifested his intent to withdraw from the crime independently, but only coincidentally with the arrival of the police, stretches credulity. This record cannot support such an implied finding.[8] We therefore hold Heath's testimony established by a preponderance of the evidence that he was an accomplice as a matter of law.[9] (*People* v. *Belton, supra*, 23 Cal.3d at pp. 523-524.)

---

[8]The Attorney General has argued that because of Heath's testimony that he "just wanted to leave the area," the trial court could make an inference that by the 14th Heath no longer shared criminal intent with the other robbers. This argument not only ignores the fact that a specific intent to commit a robbery on Heath's part was not required (*People* v. *Tewksbury, supra*, 15 Cal.3d at p. 960), but also overlooks the fact that immediately after making this statement, Heath testified he drove the robbers to the ranch, knowing they were going there for the purpose of committing a robbery. Moreover, there is a dearth of evidence suggesting that Heath drove the robbers for any purpose other than aiding them in completing the robbery. (See *People* v. *Patrick* (1981) 126 Cal.App.3d 952, 968 [179 Cal.Rptr. 276]; *People* v. *Yarber, supra*, 90 Cal.App.3d at p. 916.) When viewed in context, a trial court could not reasonably have drawn the inference that he had withdrawn from the commission of the crime. We admit that our discussion on this issue as an "implied finding" is intellectually inconsistent with our previous discussion in which we have acknowledged as a practical matter the trial court was deprived of weighing the facts on this point.

[9]An intellectually exciting, but emotionally demanding aspect of personal involvement in the development of the common law is the recognition that our decisions often cut both ways. (Compare *People* v. *Tewksbury, supra*, 15 Cal.3d 953, 960 with *People* v. *Patrick, supra*, 126 Cal.App.3d at p. 967, fn. 10; see also *People* v. *Valenzuela, supra*, 130 Cal.App.3d at p. 909, fn. 2.) Here, our holding on the accomplice issue results in an acquittal. Examined prospectively, however, in addition to the correctness of this single decision, we believe the administration of justice is better served by applying the definition of accomplice which we have used here to avoid the acquittal in the trial of future cases of those defendants whose behavioral profile matches that of Heath in this case. It would indeed be a travesty to redefine accomplice here in order to affirm the judgment with the ultimate effect that this same definition would result in the acquittal of an unknown number of guilty persons in the future. We refuse to fall prey to the maxim that "hard cases make bad law."

## C

■ A conviction may not be based on the uncorroborated testimony of an accomplice. (§ 1111; *People v. Belton, supra*, 23 Cal.3d 516, 526.) "'To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. [Citation.] "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense . . . ."'" (*People v. Szeto, supra*, 29 Cal.3d 20, 27 [171 Cal.Rptr. 652, 623 P.2d 213].) "If the sum total of all of the evidence (other than the accomplice's testimony), connects the defendant to the commission of the offense the requirements of Penal Code section 1111 are satisfied." (*People v. Manson* (1977) 71 Cal.App.3d 1, 36 [139 Cal.Rptr. 275].)

■ After application of these rules in our independent search of the record, we are unable to find any evidence which, absent Heath's testimony, connects Martinez to the commission of the robberies of which he was convicted. Our conclusion, reached independently, is the same as that of the People. At oral argument the deputy attorney general candidly responded to our questions that if Heath were an accomplice, there was insufficient evidence to support the conviction. Because of our concern with this issue, we asked for additional briefing on this question. Once again, the deputy attorney general, with admirable candor for which we express our appreciation, has responded that "[a]fter reexamination of the record respondent's position remains unchanged given the current state of the law on corroboration."[10]

---

[10]In our request for supplemental briefing, we asked counsel what methodology *should* be employed in analyzing the sufficiency of the corroboration. The deputy attorney general who responded took our invitation literally, asserting "existing law is overly restrictive and a more liberal approach should be taken." In fairness to him and to the argument he makes, we believe we should repeat that argument verbatim in order to expedite review of this issue by the California Supreme Court.

"[S]ection 1111, by its own words, merely requires 'Such other evidence as shall tend to connect the defendant with the commission of the offense.' It does not require evidence which, without 'interpretation and direction' of the accomplice's testimony, connects the defendant to the crime.

"The jaundiced view with which the law looks upon the testimony comes from a tainted source and is often given in the hope or expectation of leniency or immunity. (*People v. Comstock* (1956) 147 Cal.App.2d 287, 297.) So be it. The possible bias of an accomplice should be brought out, but it should only go to the weight of his testimo-

No witness other than Heath identified Martinez as one of the robbers. Leonardo indicated the complexion of "the individual on [defense counsel's] left" (presumably Martinez) was exactly like that of the robber with the light complexion. However, he also testified the light-complexioned robber had a beard. Both Martinez and Heath denied Martinez had a beard at the time the robberies occurred.

Although certain testimony by both Officer Burke and Olea corroborated Heath's testimony, it did nothing more than show "the commission of the offense or the circumstances thereof." By failing to produce any corroborating evidence which would tend in any way to connect Martinez with the commission of the robberies, the prosecution did not present a prima facie case. (*People* v. *Belton, supra,* 23 Cal.3d at p. 527; *People* v. *Hornbeck* (1933) 128 Cal.App. 649, 650 [18 P.2d 71].) We therefore conclude the trial court erred in denying Martinez' motion to acquit on counts three and five.

---

ny. To impose the burden of corroboration required by the courts is to erect a wholly artificial barrier to the admission of probative evidence.

"Instead, the law should require no more than corroboration of facts which tend to link the defendant to the crime. There is no reason why such corroborating evidence could not require assistance from the testimony of the accomplice to be meaningful. If there is independant [*sic*] evidence which corroborates the accomplice's testimony, then the accomplice's testimony has been sufficiently corroborated and should be admitted. . . .

"Heath testified on the night of the robberies in question he drove two men to the area while appellant rode behind on his green Kawasaki motorcycle. The motorcycle was left behind and appellant got into the car and proceeded further. When the car stopped the three robbers exited. They had a single flashlight amongst them. They also had two guns, a .25 automatic and another gun that looked like a .45. They also carried a pillowcase, which had been taken from their hotel at Heath's suggestion.

"Leonardo Olea, a farmworker, testified he was awakened by three robbers. The robbers had a single flashlight which they pointed in his eyes so he could not see. Two of the men had guns, one larger than the other. The stolen money was placed in a pillowcase. While Olea could not identify the men, he said they were pochos i.e., Mexican-Americans.

"Oceanside police officer Robert Burke testified after the robbery he found the green Kawasaki motorcycle and a pillowcase with the words 'Specialized Linen Rental Service, Rented—Never Sold' printed on it. This would appear to have come from the hotel or motel.

"The type and color of the motorcycle, the number of the robbers, the racial identification of appellant, the single flashlight, the number and type of guns and the pillowcase were all factors related by Heath which were corroborated by independent testimony. They all tended to link appellant to the crime charged.

"Respondent would submit that under a literal reading of Penal Code section 1111 there has been corroboration of Heath's statement. Even if Heath remained an accomplice, there has been sufficient corroboration of his testimony to connect appellant with the commission of the crime."

## III

Martinez also appeals the judgment entered after he pleaded guilty in another case, CR 48564 (the San Diego case; see *ante*, fn. 2). The sole issue is whether Martinez is entitled to additional credit for the time he served in presentence custody. (See § 2900.5.)[11] For our purposes, the relevant chronology is as follows:

| 1978 | November 16 | Martinez committed the burglary charged in this case. |
|---|---|---|
| | November 20 | Arrested for committing an unrelated burglary in Los Angeles. |
| 1979 | January ? | Allegedly served with a "hold" based on the San Diego charges while he was awaiting trial on the Los Angeles offense. |
| | September 6 | Sentenced in the Los Angeles case. (16 months with credits of 329 days including 82 days under section 4019 or credit for 247 actual days in custody. The record did not indicate how the 247 days were determined.) |
| | October 18 | Booked into San Diego County jail while still serving his Los Angeles sentence. |
| | November 14 | An information issued in this case. |
| | December 30 | Paroled from Los Angeles.[12] |
| 1980 | January 10 | Pleaded guilty in the San Diego case. |
| | February 22 | Sentenced in the San Diego case. (The plea bargain form states in part, " . . . concurrent time, credit for time served.") |
| | July 3 | Credit of 82 days granted in the San Diego case. (See *ante*, fn. 2.) |

[11]Section 2900.5, subdivision (b) provides: "For the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted. Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed."

Subdivision (d) provides: "It shall be the duty of the court imposing the sentence to determine the date or dates of any admission to and release from custody prior to sentencing, and the total number of days to be credited pursuant to the provisions of this section. The total number of days to be credited shall be contained in the abstract of judgment provided for in Section 1213."

[12]Martinez received 55 days custody credit (Dec. 30, 1979 to Feb. 22, 1980, the date he was sentenced in the San Diego case) plus 27 days conduct credit when the ex parte probation report to the court on July 3, 1980, resulted in an amendment to the abstract of judgment in the San Diego case.

Martinez ties his argument of entitlement to credit for time spent in custody before December 30, 1979, when he was paroled on the Los Angeles case, to the terms of his plea bargain. He explains the phrases "concurrent time, credit for time served" in his plea bargain were hinged to his expectation that he had bargained for credit for *all* time served in the Los Angeles case. He says although he received a concurrent sentence, the balance of his bargain was not kept because he has not received appropriate credit.

It is helpful to separate Martinez' incarceration before December 30, 1979, into two periods. The first starts in January 1979 when Martinez was allegedly served with a hold arising from the San Diego case and continues until sentencing in Los Angeles on September 6, 1979; the second is from September 6, 1979, until December 30, 1979.

Absent his plea bargain, *In re Rojas* (1979) 23 Cal.3d 152 [151 Cal.Rptr. 649, 588 P.2d 789] is dispositive of his claim for credit for any time after September 6, 1979. Once the prison term started in the Los Angeles case, the pending San Diego case had no effect upon his liberty. (*Id.*, at p. 156.) Here, however, Martinez argues his plea bargain represents a negotiated exception to this rule.

Examining his contention in the light most favorable to his argument, we conclude otherwise. It is not too much to assume that if Martinez really thought his bargain included credit for all the time served in the Los Angeles case, approximately 15 months including conduct credits, that an express statement to this effect would have been set out in the plea bargain to reflect the reality that his punishment in the San Diego case would be only about 6 months in custody for the unrelated burglary he committed in San Diego. It is also not too much to assume that had he wanted to escape the application of *Rojas*, decided about a year earlier, his plea bargain would have contained something more articulate than the generalized phrases which were used. Martinez is thus not entitled to credit for the second period referred to above.

The first period—January 1979 to September 6, 1979—presents a different problem, however. ■ Where more than one judicial proceeding is pending against a defendant simultaneously creating a dual basis for custody, credit is appropriately applied unless consecutive sentences are imposed.[13] (*People* v. *Brown* (1980) 107 Cal.App.3d 858, 863

[13]We recognize that the presentence credit problems with which we deal here are due in large part to theoretical inconsistencies inherent in the concept of concurrent sen-

[166 Cal.Rptr. 144].) Although the record does not reflect the "hold" to which Martinez has made reference, his claim at sentencing was sufficient notice to the trial court on this issue. (See § 2900.5, subd. (d).) Here, where his administrative claim was also unavailing, we believe we must remand this case to allow the trial court to determine whether a hold was imposed and the effective date of any such hold.[14] (Cf. *People* v. *Brown, supra*, 107 Cal.App.3d 858, 861.) Upon remand, the trial court shall also determine the conduct credits to which Martinez may be entitled. (*People* v. *Sage* (1980) 26 Cal.3d 498, 509 [165 Cal.Rptr. 280, 611 P.2d 874].)

## Disposition

Judgment reversed in case No. CRN 6044 with instructions to the trial court to enter a judgment of acquittal. Judgment affirmed in case

tencing, combined with the temporal practicalities involved in bringing a defendant to trial which often result in the passage of a substantial period of time between defendant's arrest and the entry of judgment. Were the system perfectly efficient in the sense that arrest and conviction occurred simultaneously, sentences could be totally concurrent only to the extent that arrests for more than one crime occurred at the same time. In all other cases, *In re Rojas, supra*, 23 Cal.3d 152 would dispose of a defendant's claimed entitlement to presentence credits.

In our imperfect system, however, defendants cloaked with a constitutional presumption of innocence are often incarcerated before trial. Assuming that bail is at least a theoretical possibility, service of a "hold" based on other alleged offenses makes the pre-conviction custody partially attributable to both sets of charges. Accordingly, section 2900.5 mandates presentence custody credits where concurrent sentences are ultimately imposed.

What should be obvious is that this system merely makes the later concurrent sentence begin as of the date the hold is served. To the extent this result is objectionable, the objection would appear to relate most basically to the entire concept of concurrent sentencing for unrelated offenses.

[14]We believe a careful examination of *In re Ewing* (1978) 78 Cal.App.3d 455 [144 Cal.Rptr. 229] does not mandate a different result. That case was decided before *In re Rojas, supra*, 23 Cal.3d 152 and before the 1978 amendment to section 2900.5, subdivision (b). (See Stats. 1978, ch. 304.) That amendment added the last section in 2900.5, subdivision (b) as follows: "Credit shall be given *only once* for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed." (Italics added.) There is nothing in *Ewing* to indicate whether the sentence imposed was concurrent or consecutive. Obviously if the sentence were consecutive, it is clearly distinguishable from the case before us. Moreover, the footnote in *Ewing*, 78 Cal.App.3d at page 459 appears to reflect an independent basis for the court's holding. "The record shows there were three holds, including the hold in question. Even assuming the truth of Ewing's assertion he could have posted the bail fixed for the Alameda County forgery charge, there were still left two holds other than the hold under consideration. Thus there is no showing the hold here in question had any relationship to Ewing's ongoing custody." This expression by the *Ewing* court appears to furnish an independent and alternative factual basis for the court's holding. Because of these considerations, we have concluded *In re Ewing* is not dispositive of the issue in the instant case.

No. CR 48564; remanded solely for the purpose of redetermination of presentence credit consistent with this opinion.

Langford, J.,* concurred.

**STANIFORTH, Acting P. J.**—I respectfully dissent.

This case involves the calculated and systematic mass robbery of helpless migrant farm workers by professional bandits. The many victims were attacked in their isolated rural bunk house in the middle of the night, terrorized, robbed at gunpoint of their meager possessions. Martinez had predicted to his coconspirators that few if any of the migrant workers would remain to complain or testify. He was almost correct. Many of these victims—as Martinez knew—were undocumented aliens. Their fear of contact with authorities was an article of faith. Rather than come forward as a victim-witness and risk deportation, they disappeared. Such characteristics made these poor human beings, particularly vulnerable, easy prey for a conscienceless brigand. Before committing these robberies, Martinez told three members of his gang it would be "easy" to rob alien farm workers. He had done so before. The victims would not report the crimes. He was almost correct. Only one brave victim, Olea, remained to testify.

The trial court dismissed eight counts against Martinez because the victims could not be located. The majority opinion now reverses Martinez' conviction on the remaining two counts (and by this decision will free him). The basic reason assigned? There is not enough evidence as a matter of law to convict him.

Several legally and factually flawed predicates are assumed by the majority in order to reach this patently unjust result.

DISCUSSION

I

First, the majority err in holding that, as a matter of law, Heath was Martinez' accomplice. Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom. (*People* v. *Tewksbury* (1976) 15

---

*Assigned by the Chairperson of the Judicial Council.

Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335].) Here, there is a dispute as to the inferences to be drawn from Heath's testimony. As the following discussion makes clear, a reasonable trier of fact could have found (had the issue been presented to it) that Heath was not an accomplice as to the two robberies of which Martinez was convicted.[1] Therefore, the majority err in holding he was an accomplice as a matter of law.

The fact that Heath was prosecuted for the same offense as Martinez does not by itself establish him to be an accomplice as a matter of law. (*People* v. *Gordon* (1973) 10 Cal.3d 460, 467 [110 Cal.Rptr. 906, 516 P.2d 298].) Nor is Heath necessarily an accomplice merely because he was held to answer for the same crimes as Martinez and then granted immunity.

Nor did Heath necessarily become an accomplice if it be deemed that he aided in the commission of the crimes. "Criminal liability as a principal attaches to those who aid in the commission of a crime only if they also share in the criminal intent . . . or, in the language of section 31, abet the crime." (*People* v. *Tewksbury, supra*, 15 Cal.3d at p. 960.) Heath was thus an accomplice only if at the time he acted he had guilty knowledge and intent with regard to the commission of the crime. (*People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103].) The burden of proof of the issue is on the defendant. (*People* v. *Tewksbury, supra*, at p. 968; *People* v. *Belton* (1979) 23 Cal.3d 516, 523 [153 Cal.Rptr. 195, 591 P.2d 485].)

The undisputed facts disclose Heath was Martinez' accomplice as to the first two of the series of robberies—those on which Martinez was acquitted—the charges were dismissed for lack of witnesses. However, on the third night, Heath's attitude, intent changed. After two nights of robberies, Heath "just wanted to leave the area." He no longer wanted to commit any robberies, but the group wanted to commit one more. With this state of mind, Heath drove the trio to the area where they had committed robberies the first night. Heath was aware of the crimi-

---

[1]We are required to imply findings of fact to support the judgment and the conclusion that Heath was not an accomplice and needed no corroboration; or if an accomplice, he was corroborated (*In re Pratt* (1980) 112 Cal.App.3d 795, 929 [170 Cal.Rptr. 80]; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 329 [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Henderson* (1949) 34 Cal.2d 340, 343 [209 P.2d 785].) Substantial evidence supports either of these alternatives.

nal intent of Martinez and his cohorts to return again to a ranch near Vista and rob helpless aliens. As in the earlier robberies, his function in that illegal scheme was to be "wheelman," the driver of the getaway car. However, as Heath awaited to perform that duty, fate intervened in the form of Officer Burke, who stopped and questioned him. Heath then left the area and returned to Los Angeles. He did not wait to pick up the robbing trio; he did not aid in the asportation of the loot. He did in fact abandon his agreed upon unlawful duties as getaway driver. He left the three robbers to return to the motel or to Los Angeles as best they could.[2] *Thus there is uncontroverted evidence of Heath's in fact physical withdrawal from actual participation in the crime.* The effect of Heath's withdrawal from participation was to impede, by denial of the means of escape, the fulfillment of the crime of robbery. From these facts, the trial judge could, if he believed Heath's testimony, reasonably conclude Heath had withdrawn from participation in the crime and therefore did not have the requisite intent to abet a robbery by driving the getaway car.

It was said in an early California case dealing with the law of withdrawal from criminal activity and avoidance thereby of criminal responsibility "[r]esponsibility of an accessory 'does not cease simply, because after starting the ball, he changes his mind, and tries, when too late, to stop it. To emancipate him from the consequences, not only must he have acted in time, and done everything practicable to prevent the consummation, but the consummation, if it takes place, must be imputable to some independent cause.' [Citation.]" (*People v. Ortiz* (1923) 63 Cal.App. 622, 670 [219 P. 1024]; see *People v. King* (1938) 30 Cal.App.2d 185, 204 [85 P.2d 928]; *People v. Jones* (1961) 197 Cal.App.2d 503, 508 [17 Cal.Rptr. 252].) However, the California Supreme Court in *People v. Zamora* (1980) 18 Cal.3d 538, 558 [167 Cal.Rptr. 573, 615 P.2d 1361], criticized this rule, saying the elimination of the withdrawal defense is "certainly not calculated to encourage the abandonment of criminal associations or goals."

If we accept without question the *Ortiz* rule (and give no heed to the *People v. Zamora* criticism of the rule), then there is substantial evidence to warrant the trier of fact finding that Heath, within time, acted

---

[2]Heath met Martinez in Los Angeles the next day. Martinez was "upset" and threatened "to beat ... [Heath's]. head" because of Heath's abandonment of the robbers, leaving them without any means of getaway excepting Martinez' Kawasaki motorcycle which was some distance down the road.

in such fashion as to indicate an intent to withdraw. He did "everything practicable to prevent the consummation," i.e., the escape, of the robbers from the crime scene with the loot. Heath agreed (conspired) to take part in a criminal group activity; he was not to participate in the act of robbing but rather his function was to aid and abet by driving the getaway car. However, Heath did not in fact carry out his agreed upon duty. His departure for Los Angeles immediately hindered the robbers in the fulfillment of the criminal act—escape from the scene. Heath could have done no more to prevent the successful culmination of the robbery other than to confess the real purpose for his presence to the questioning officer. This latter act is not required under *People v. Zamora, supra*, 18 Cal.3d at pages 557-559. Heath's departure, his absence when needed most, was a most forceful communication—by action rather than words—to Martinez and his band of robbers of an intent to withdraw from participation in the crime.

Sound public policy requires the encouragement of withdrawal from participation in crime at any stage of completion of the misdeed. Such policy should apply with greater force where the crime contemplated—as here—is yet in the conspiracy stage, where the substantive crime—the object of the conspiracy—has not yet commenced its evil course. As a matter of sound policy, Heath's acts with his declared intent—if believed—should be sufficient to establish the defense of withdrawal from participation in the crime of robbery. The law encourages the abandonment of criminal objectives at an early stage by cutting off liability at the point of withdrawal. In contrast, the majority's "in for a penny, in for a pound" approach only encourages the continuation to consummation of criminal activity once started. Here, the trial court, had the question been presented to it, could reasonably have, on the uncontradicted facts, found Heath was not an accomplice because he withdrew from participation before commencement or completion of the projected crime by use of the most graphic and most effective means possible to notify Martinez of his intent to withdraw. On the other hand, the court could have found Heath was an accomplice (if it disbelieved Heath's testimony as to his acts and intent), concluding he did not intend to withdraw from participating in the crime. The critical point is: the resolution of this fact question was for the trial court, not this court. (*People v. Tewksbury, supra*, 15 Cal.3d 953.) The majority's first error is in deciding Heath was an accomplice as a matter of law and refusal to imply findings in support of the judgment.

## II

If we pretend there was no evidence to support Heath's acts and claim of an intent to withdraw from participation, no evidence that he in fact returned to Los Angeles, no evidence that he deliberately refused to act as the driver of a getaway car and assume, arguendo, that Heath *was* Martinez' accomplice, yet Heath's testimony was adequately corroborated as required by law. The majority wrongly conclude it was not, however, by the process of restricting their examination of the record to the evidence presented by the prosecution in its case-in-chief. This is a fallacious conclusion because it rests upon an unsound legal foundation. It is grounded upon the majority's conclusion that Martinez effectively moved for acquittal under Penal Code section 1118 at the close of the People's case, thus imposing on the trial judge the burden of ferreting out and deciding the accomplice and corroboration issues at that point in the trial. This factual assumption is wrong, belied by the cold record. Martinez' motion made at the conclusion of the People's case-in-chief was not brought under section 1118. Consequently, the question of the sufficiency of the evidence to corroborate Heath's testimony was not presented to the trial court at the conclusion of the People's case-in-chief. This court is therefore required to examine the *entire* trial record in determining whether Heath (assuming he was an accomplice) was corroborated. When this is done, it becomes abundantly clear that Heath's testimony was sufficiently corroborated.

As the majority opinion openly confesses, Martinez' motion did not expressly ask for acquittal under section 1118 for prosecutorial failure to present a prima facie case. Nor did it do so by implication. Neither the form nor the substance of a section 1118 motion can be intuited from the words used or the court's response. Rather, Martinez moved to dismiss *"on the grounds there is no direct evidence that he committed any robberies at all. At best there is circumstantial evidence that he committed such robberies . . . ."* (Italics added.)

When purified of all sophistic content, the majority come to this remarkable conclusion: If a criminal defendant, at the close of the prosecution's case, moves to dismiss on the ground that the only evidence of his guilt is circumstantial (a ground that as a matter of law is unmeritorious on its face and concedes lack of merit to a § 1118 motion if made), the trial court must intuit or divine that the defendant moved instead for acquittal under Penal Code section 1118 (for prosecutorial failure to prove a prima facie case) and must scour the record for de-

fects in the prosecution's case which the movant's very words have first assured the court are not present.

Here, the majority reverse the conviction because the trial court did not do so (without request to do so) and *sua sponte* determine (1) Heath was an accomplice and (2) the corroboration of his testimony was insufficient. The majority hold this to be trial court error even though the defendant (whether tactically or inadvertently we do not know) diverted the court's attention from the precise questions that would be raised by a Penal Code section 1118 motion by conceding the validity of Heath's testimony and not raising the question of Heath's status as an accomplice. Martinez' concession that "[a]t best there is circumstantial evidence" and circumstantial evidence pointed to Martinez as one of the robbers invited the trial court not to search the record as it should have, had it been informed that a Penal Code section 1118 motion was being made.

The majority decision invites gamesplaying at least, a cynical sandbagging of the trial judge at most. Error if any was clearly invited. This fact further critically distinguishes this case from the one on which the majority rely, *People* v. *Belton* (1979) 23 Cal.3d 516 [153 Cal.Rptr. 195, 591 P.2d 485]. *Belton* held a defendant who moves for acquittal under Penal Code section 1118 *need not specify his grounds*. The Supreme Court did not by any stretch of imagination sanction a kind of gamesmanship/sandbagging the majority opinion would invite.

The majority's approach imposes an unfair and unrealistic burden on trial judges. The law requires the trial judge to determine an accomplice's status and the sufficiency of the corroboration of his testimony when made aware by some intelligible signal, a proper section 1118 motion is brought. No statute or decision has as yet been found that requires him to do so when no section 1118 motion is brought at all and his attention is, in fact, affirmatively diverted from a Penal Code section 1118 quest by the defendant's representations. Trial judges are not required to assume the role of defense counsel and to make all appropriate motions on behalf of a defendant. The majority here comes dangerously close to imposing a *Pope*-type duty on the trial court to conduct an effective defense for the criminal defendant. The majority has created a new, an unwise and unneeded procedural rule to reach a socially abhorrent result.[3]

---

[3]The majority concede that their extension of *Belton* results in "injustice" in this case and gives rise to a "difficult problem." Indeed it does. On a fundamental level, the

### III

The record here compels this conclusion: The corroboration issue was not placed before the trial court at the close of the prosecution's case-in-chief. Therefore, the question of the sufficiency of the corroboration of Heath's testimony must be determined by examining the *entire* trial record. Here, in addition to the corroborative testimony of the victim and the police (which it is argued is insufficient under the law as it now stands—but see discussion *infra*) the rational inferences from Martinez' own trial testimony independently connect him with the crime and corroborate Heath's testimony.

A defendant's own testimony, statements and admissions may afford corroboration, proof, sufficient to sustain a verdict. (*People v. Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116]; 7 Wigmore on Evidence (Chadbourn rev. ed. 1978) § 2059, p. 421; *People v. Rissman* (1956) 154 Cal.App.2d 265, 277, 278 [316 P.2d 60].) In his direct testimony Martinez was able to recall that in the late evening hours of December 13, 1978, he was in Los Angeles with a girlfriend (who could not be located). Yet when asked if he was in the company of Mr. Heath on the 11th, 12th or 13th of December 1978, he replied "not to my recollection." Did he rob anyone near Vista in the early morning hours of December 14, 1978? He answered "not to my recollection." Did he rob anyone on the evening of December 13, 1978? He again replied "not to my recollection." Martinez' remarkable lack of memory followed closely upon a most detailed and memory-refreshing account by Heath and Olea of the not-too-forgettable events of December 11 through 14, 1978.

3A Wigmore on Evidence (Chadbourn rev. ed. 1970) section 1042, page 1056 sets forth this premise: "A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an as-

---

problem with the majority's unwarranted extension of *Belton* is that it injects yet more gameplaying in a criminal trial. The defendant is insulated from the consequences of ineffective strategy because if he errs, the trial judge must step in and conduct his defense for him. Ours is an adversary system; a criminal trial is not a game, with victory going to the most skillful player. It is a search for truth with the proviso that this interest does not outweigh the need to protect certain of our fundamental preferred values (e.g. due process, freedom from unreasonable searches and seizures, the privilege against self-incrimination, etc.) Extending *Belton* to cases such as this rewards gameplaying by the defendant at the expense of the integrity of the factfinding process. As applied here, this approach operates not to safeguard the innocent, but to free the guilty, and it does so without advancing any fundamental interests.

sertion of the non-existence of the fact. This is conceded as a general principle of evidence (§ 1071 *infra*). There may be explanations, indicating that the person had in truth no belief of that tenor; but the conduct is 'prima facie' an inconsistency." And Wigmore further observes an "unwilling witness often takes refuge in a failure to remember . . . ." (*Id.*, p. 1061; fn. omitted.) Thus Martinez' repeated refrain *non mi ricordo* in contexts where a direct affirmative or negative was patently called for warrants an inference not favorable to his assertion of innocence.

The rule is well established that "[w]here a statement is made within the presence and hearing of an accused, which is incriminatory or accusatory in character, and such statement is not denied by him, the statement and the fact of his failure to deny are admissible as an admission of the statement's truth." (3 Wharton, Criminal Evidence (1973) § 700, pp. 501-502; fn. omitted.) And "[a]n evasive or unresponsive reply to an incriminatory or accusatory statement is tantamount to silence, in which case the statement and the reply are admissible as an admission of the statement's truth." (Wharton, *supra*, p. 505; fn. omitted.) If such conduct—evasive, nonresponsive answers—given in an extrajudicial setting may under certain circumstances constitute an admission of the accusatory statement's truth then certainly that same conclusion follows where the *non mi recordo* responses are given in court.

Under California law, inferences from the testimony of the defendant may be considered in corroboration of an accomplice's testimony (*People* v. *Allen* (1951) 104 Cal.App.2d 402, 411 [231 P.2d 896]; *People* v. *Malone* (1947) 82 Cal.App.2d 54, 63 [185 P.2d 870]) and the making of false or evasive or contradictory statements may constitute an admission. (*People* v. *Wayne* (1953) 41 Cal.2d 814, 822-823 [264 P.2d 547]; *People* v. *Wright* (1949) 94 Cal.App.2d 70, 80 [210 P.2d 263]; *People* v. *Simmons* (1946) 28 Cal.2d 699, 712 [172 P.2d 18].) The trial court could and did see Martinez' evasive, nonresponsive answers. The trial court was clearly entitled to draw as inference of deception, falsity, and admission of the truth of the accusatory facts implicit in Martinez' repeated *non mi ricordo* responses. Martinez' own evasive, nonresponsive answers thus supplied the independent corroboration of Heath's testimony required by Penal Code section 1111. (Cf. *People* v. *Sullivan* (1904) 144 Cal. 471, 473 [77 P. 1000].)

The fundamental rule is: Corroborative evidence, direct or circumstantial, is sufficient if it tends to connect the defendant with the crime, even though it is slight and entitled, if standing alone, to little weight. (*People* v. *Wade* (1959) 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Negra* (1929) 208 Cal. 64, 69, 70 [280 P. 354].) Martinez' guilt-admitting responses on the witness stand were more than sufficient to corroborate Heath—if corroboration was necessary.

### IV

In addition to the inferences derived from Martinez' evasive nonresponses to questioning, a mass of evidence affirms the truthfulness of Heath's testimony. At least 10 important facts of the crimes testified to by the victim Olea and Officer Burke mirrored in exact detail those provided by Heath. Heath's testimony as to the number of the robbers, their race, their sex, the time of the robbery, the place of the robbery, the robbers' use of two handguns, one larger than the other, the robbers' use of a pillowcase stolen from a hotel, the robbers' use of a single flashlight, and the green Kawasaki motorcycle was confirmed with exactitude by the testimony of Olea and Burke.

The large number of points of agreement between Heath and the nonaccomplice witnesses, and the complete absence of any contradictory points, renders virtually inescapable the conclusion that Heath is a believable witness and was telling the truth about Martinez' involvement in the robberies. Nevertheless, as the law presently stands, does this evidence by itself sufficiently corroborate Heath's testimony so as to support the verdict? Does it *independently* connect Martinez to the robberies? "'To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged.'" (*People* v. *Szeto* (1981) 29 Cal.3d 20, 27 [171 Cal.Rptr. 652, 623 P.2d 213].) Martinez argues the testimony of Olea and Burke, despite its obvious probative force in making Heath's testimony absolutely believable, connects Martinez with the robberies only when read in conjunction with Heath's testimony. Martinez argues it is therefore to be deemed valueless.

Counsel for Martinez conceded in open court "circumstantial" evidence connected Martinez with the Olea robberies. The majority opinion bursts with the admission there is no doubt that Martinez is

guilty as charged. Why such concessions from the majority as well as defense counsel?

First, the testimony of Heath has such realism, such color, such detail as would require the word skills, the imagination of a Shakespeare or a Faulkner to fabricate such a story. Secondly Heath's story has at least ten points of absolute congruence with the testimony of two totally believable witnesses.

A single thread from the white pillow case found on Martinez or a key in his pocket that would fit the door of the bunkhouse, or a shoe print at the robbery site of the same size, make as Martinez' would meet the ritualistic requirement of tending to connect the defendant with the crime. We have no such talismanic bits of evidence here. However, the 10 points of agreement are analogous to the requirement of a minimum number of points of similarity required before a "scientific" opinion can be given as to the identity of a depositor of a questioned fingerprint. The same unanswerable reasoning (an astronomical degree of mathematic improbability of error is present where there are 10 or more points of congruence found on a questioned fingerprint) assures us that Heath is telling the truth. Martinez was one of the three robbers identified by Olea.

The code requires "such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." As to the matter of that evidence requirement, the Supreme Court in *People v. Henderson* (1949) 34 Cal.2d 340, 342-343 [209 P.2d 785], said: "[C]orroborating evidence . . . is sufficient if it connect[s] the defendant with the commission of the crime in such a way as reasonably to satisfy the fact finding body that the accomplice is telling the truth." For the same rule see *People v. Medina* (1974) 41 Cal.App.3d 438, 460 [116 Cal.Rptr. 133] (hg. den. by Supreme Ct.); *People v. Randono* (1973) 32 Cal.App. 3d 164, 173 [108 Cal.Rptr. 326] (hg. den. by Supreme Ct.).

In *Henderson, supra*, the Supreme Court in discussing the mode of proof, the nature of the evidence that would constitute corroborative evidence said: "The testimony of Roberts that he held the black pistol and that the defendant held the shotgun at the time of its discharge has some corroboration in the testimony of the victims in the cafe who stated that one of the culprits had a shotgun and the other a black pistol.

"The testimony of the victims in the cafe that both men wore flesh-colored stockings as hoods with slits cut in them for eye holes shows circumstances in substantiation of the testimony of Roberts that he and the defendant wore hoods so described by him at the time of the commission of the crime.

"We are satisfied that the cumulative effect of the testimony of the women companions of the two men, the testimony of Roberts' sister and the testimony of the victims in the cafe, none of whom could be deemed accomplices, point sufficiently to the establishment of the fact that the defendant was the other participant in the crime, and that the code requirements of evidence tending to connect the defendant with the commission of the crime have been sufficiently met." (*Id.*, at p. 346.) (See also *People* v. *Sullivan, supra*, 144 Cal. at p. 472, where similar "mirror image" testimony was held corroborative.) Thus the evidence received from Olea and Officer Burke was of the exact same type as approved by the Supreme Court. This specie of evidence patently fulfills the primary reason for the requirement of corroboration—distrust of accomplice testimony. (*People* v. *Robinson* (1954) 43 Cal.2d 132, 141 [271 P.2d 865].) Olea and Burke's evidence made Heath's believable. If corroboration was necessary, it was present in the required quantum in the People's case-in-chief.

## V

At common law, the uncorroborated testimony of an accomplice could sustain a conviction. (See 7 Wigmore (Chadbourn ed. 1978) Evidence, § 2056.) A practice gradually developed, however, of having the trial judge comment to the jury upon the weight and credibility of the accomplice's testimony and the desirability of corroboration, and in roughly half of the jurisdictions in the United States this customary practice has become a fixed rule of law by statute.

A debate arose early as to the nature of the corroborative evidence required. Some English jurists took the position corroboration of the facts of the crime which did not independently implicate the defendant would not do. As stated by Lord Abinger, C.B., in *R.* v. *Fawler* (1837) 8 Car. & P. 106, 108: "A man who has been guilty of a crime himself will always be able to relate the facts of the case, and if the confirmation be only on the truth of that history, without identifying the person, that is really no corroboration at all." Chief Baron Joy, however, was of the opposite view: "The correct and accurate manner in which an ac-

complice details the circumstances of the transaction shows that he was cool and collected, that he possessed observation, that his recollection is fresh, that he was an observer, not an inventor of facts and incidents; *and if we find that in every point in which the evidence of other witnesses can be brought into contact with his, they fit into one another and correspond exactly, it is good ground for presuming that his entire narrative is correct*.... The accomplice, who must be supposed to know the whole details, is expected to relate them, and is thus exposed to detection in a variety of ways." (Joy, Evidence of Accomplices (1844) p. 10; italics added.)

In California, the debate was resolved by statute. Penal Code section 1111, as originally enacted, provided: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof." Accordingly, the early California cases, without exception, and in conformity with this express legislative provision, held that corroborating evidence, to be sufficient, must tend to connect the defendant to the crime without the aid of the testimony of the accomplice. (See, e.g., *People v. Morton* (1903) 139 Cal. 719, 727 [73 P. 609].)

In 1911, however, the Legislature amended the statute to delete the phrase *"which in itself, and without the aid of the testimony of the accomplice."* The section now reads: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

In 1915, the Supreme Court had occasion to rule on the meaning of the section as amended. In a decision which can fairly be described as surprising, the court held (but not without dissent) that the amendment did not change the meaning of the section "at all." (*People v. Robbins* (1915) 171 Cal. 466, 473-474 [154 P. 317].) The court cited none of the familiar canons of statutory construction, nor did it cite any evidence of legislative intent.[4]

---

[4]It is hornbook law that the Legislature is presumed to know the decisions of appellate courts and to have them in mind when amending statutes which the courts have

The *Robbins* rule—the inclusion of a mode of proof excluded by the Legislature—has been questioned. "In view of the more recent decisions of the Supreme Court we conclude the test suggested in *People v. Morton, supra,* [139 Cal. 719] and followed by *People v. Reingold, supra,* (1948) 87 Cal.App.2d 382 (197 P.2d 175)] is not an exclusive method of analyzing the sufficiency of evidence corroborative of the testimony of an accomplice." (*People v. Griffin* (1950) 98 Cal.App.2d 1, 28 [219 P.2d 519]; *People v. Allen* (1951) 104 Cal.App.2d 402, 413 [231 P.2d 896], and cases cited.)

The rule requiring corroboration of an accomplice's testimony is somewhat an anachronism in modern evidence law. As a general rule, a criminal conviction can rest on the uncorroborated testimony of witnesses whose veracity is suspect. Those who have an interest in the case need not be corroborated; nor do those who have been convicted of crime. Yet an accomplice must be. The rule requiring corroboration has been widely criticized (see 7 Wigmore, Evidence (Chadbourn rev. ed. 1978) § 2057) and roughly half the jurisdictions in the country have never adopted it. Moreover, some of those states that do have the rule have sought to repeal it. (See, e.g., N.Y. Com. on the Admin. of J., 3d Supplemental Rep., p. 16 (Leg. Dec. 1937, No. 77) quoted in Wigmore, *supra,* at p. 420.)[5]

construed. It is equally well settled that a substantial change or deletion in the language of a statute is presumed to change its meaning. (See, e.g., *Subsequent Injuries Fund v. Industrial Acc. Comm.* (1963) 59 Cal.2d 842, 844 [31 Cal.Rptr. 477, 382 P.2d 597]; *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 231 [273 P.2d 5]; *Hoffman v. McNamara* (1929) 102 Cal.App. 280, 285 [282 P. 990]; see generally 1A Sutherland (4th ed. 1972) Statutory Construction, § 22.30.)

[5]As Chief Baron Joy notes: "Why the case of an accomplice should require a particular rule for itself; why it should not, like that of every other witness of whose credit there is an impeachment, be left to the unfettered discretion of the judge, to deal with it as the circumstances of each particular case may require, it seems difficult to explain. Why a fixed, unvarying rule should be applied to a subject which admits of such endless variety as the credit of witnesses, seems hardly reconcilable to the principles of reason. But, that a judge should come prepared to reject altogether the testimony of a competent witness as unworthy of credit, before he had ever seen that witness; before he had observed his look, his manner, his demeanour; before he had had an opportunity of considering the consistency and probability of his story; before he had known the nature of the crime of which he was to accuse himself, or the temptation which led to it, or the contrition with which it was followed;—that a judge, I say, should come prepared beforehand, to advise the jury to reject without consideration such evidence, even though judge and jury should be perfectly convinced of its truth, seems to be a violation of the principles of common sense, the dictates of morality, and the sanctity of a juror's oath...." (Joy, Evidence of Accomplices (1844) 4. For a particularly scholarly Connecticut case exploring the foundations of the rule and criticizing its retention in the 20th century see *State v. Carey* (1904) 76 Conn. 342, 346-349 [56 A. 632].)

The reason for the rule requiring corroboration of an accomplice's testimony is said to be this: An accomplice's veracity is suspect because he may have secured a promise of leniency in exchange for his testimony. (Wigmore, *supra*, at p. 417.) The rule is not based on the notion that one who was involved in a criminal enterprise is, by virtue of that fact, inherently untrustworthy. As Wigmore notes: "We have passed beyond the stage of thought in which [an accomplice's] commission of crime, self-confessed, is deemed to render him radically a liar.... The extreme case of the wretch who fabricates merely for the malicious desire to drag others down in his own ruin can be no foundation for a general rule." (*Ibid.*) The problem with the rule, of course, is that even the promise of immunity is not always present. If that element is lacking in a particular case, so is the element of distrust. And even where present, its influence will be highly variable. This has led Wigmore and others to conclude that the rule requiring corroboration of accomplice testimony in all cases is unsound.

The section's legislative purpose, if it is to assure an accomplice's veracity, would be amply served by allowing *the requisite corroborative evidence to refer to the accomplice's testimony in order to be meaningful.* The fact that the accomplice has told the truth about some aspects of the crime is some evidence that he can be believed as to other aspects. And this is especially true where, as here, the accomplice's testimony is highly detailed and verified in every respect. Olea's and Officer Burke's detailed verification of Heath's testimony should be more than enough to satisfy the legislative purposes expressed in Penal Code section 1111.

The corroborative evidence admitted here does independently *connect* the defendant to the crime scene, it independently establishes the truthfulness of the accomplice "testimony." (*People v. Henderson, supra*, 34 Cal.2d 340.)

Judicial recognition of the fact that accomplices are really no less reliable than convicted felons or interested witnesses is already evidenced by the rule that the required corroborative evidence, if in the correct form, will satisfy the statute even when "slight, and entitled to little consideration when standing alone." (*People v. Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116].)

The majority remand case No. CR 48564 to the superior court for a redetermination of Martinez' entitlement to presentence credit. This

task should be delegated to the Department of Corrections and not be imposed on an already overburdened trial judge. (See *People* v. *Sage* (1980) 26 Cal.3d 498, 507, fn. 7 [165 Cal.Rptr. 280, 611 P.2d 874].)

I would affirm the trial court judgment.

Respondent's petition in No. 11727 for a hearing by the Supreme Court was denied July 28, 1982. Richardson, J., was of the opinion that the petition should be granted.