[Crim. No. 6490. In Bank. Mar. 11, 1960.]

THE PEOPLE, Respondent, v. ELIZABETH ANN DUNCAN, Appellant.

*Assigned by Chairman of Judicial Council.

Frank Duncan, Leonard Nasatir, Ward Sullivan and Burt M. Henson for Appellant.

A. L. Wirin, Gerald L. Rosen and Richard L. Lissner as Amici Curiae on behalf of Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Roy A. Gustafson, District Attorney (Ventura), for Respondent.

GIBSON, C. J.—Luis Moya and Augustine Baldonado confessed to the police that they had killed Olga Duncan, the wife of defendant's son Frank, and in their confessions stated that defendant had hired them to do the killing. The three were indicted for murder and tried separately. Defendant pleaded not guilty and not guilty by reason of insanity. The jury found her guilty of murder in the first degree and fixed the punishment at death. Pursuant to stipulation, the court sitting without a jury passed upon the sanity issue, and defendant was found to have been sane at the time of the commission of the offense. Her motion for a new trial was denied, and the appeal comes before us automatically under subdivision (b) of section 1239 of the Penal Code.[1]

The facts stated below are summarized from the testimony of a number of witnesses. Moya and Baldonado testified regarding the arrangements defendant made with them and the manner in which they carried out the plan to kill Olga. Several persons testified concerning threats made by defendant against Olga, efforts of defendant to obtain assistance in killing her, and other circumstances connected with the crime.

In 1956 defendant moved to Santa Barbara with her 27-year-old son, Frank, an attorney who was then unmarried. Late in 1957 she was hospitalized as a result of taking an overdose of sleeping pills, and she explained to her doctor that she had taken them because she was afraid Frank would "leave her." While visiting defendant in the hospital, Frank met Olga, who was working there as a nurse. Defendant objected to Frank's seeing Olga and telephoned her almost

---

[1]After the trial of defendant, Moya and Baldonado pleaded guilty to murder in the first degree, and their punishment was fixed at death. (*People* v. *Moya, post,* p. 819 [3 Cal.Rptr. 360, 350 P.2d 112]; *People* v. *Baldonado, post,* p. 824 [3 Cal.Rptr. 363, 350 P.2d 115].)

daily for three months. During the course of these calls, which defendant discussed with a friend, Mrs. Emma Short, or made in her presence, she told Olga to "leave her son alone" and frequently threatened to kill her if she did not stop seeing him. On one occasion, when Olga said that she and Frank were going to be married, defendant replied, "You'll never marry my son, I'll kill you first."

Frank and Olga were secretly married on June 20, 1958, and when defendant learned of the marriage she declared that she would not allow them to live together. Frank stayed at defendant's home until the end of June, visiting Olga in her apartment. During one of these visits defendant knocked on the door and angrily demanded that Frank come home. A quarrel ensued, and he left with her. A few days later he started to live with Olga at another apartment, keeping the new address secret from defendant.

About the middle of July 1958 defendant told Mrs. Barbara Reed, whom she had known for several years, that Olga had become pregnant by another man and was trying to "frame" Frank. She offered Mrs. Reed $1,500 to assist her in killing Olga. Mrs. Reed replied that she would think the matter over, and later she informed Frank of the proposal his mother had made to her. Shortly thereafter Frank moved back to defendant's home.

In the early part of August defendant arranged with an ex-convict, Ralph Winterstein, to assist her in carrying out a fraudulent plan for the annulment of the marriage between Frank and Olga. Defendant posed as Olga and Winterstein as Frank. After a brief uncontested hearing in which Winterstein, as the plaintiff, testified that Olga had not lived with him since their marriage, that she refused to do so, and that she had told him she had never intended "to go through with the marriage," a decree was granted to the plaintiff. Defendant later persuaded Mrs. Short to propose to Winterstein that he "take care of Olga." Winterstein refused but did not report the incident because he was afraid of getting into trouble as a result of the fraudulent annulment.

In the middle of August defendant discovered where Olga was living and gained admittance to the apartment in her absence, apparently for the purpose of discovering whether any of Frank's clothes were there. She said to the manager of the apartment house, "She is not going to have him. I will kill her, if it is the last thing I do."

Defendant told Mrs. Diane Romero, whose husband Rudolph was a client of Frank, that Olga was blackmailing Frank and asked her to help "get rid" of Olga. At defendant's request Mrs. Romero went to Olga's apartment to "look the place over," and Olga answered the door. Mrs. Romero recognized her as a nurse who had cared for her several years earlier, and she left after a short visit. Thereafter defendant offered Rudolph Romero money to "get rid" of Olga, and he refused.

During the time that she was seeking the assistance of the Romeros, defendant met Mrs. Rebecca Diaz, in whose house the Romeros lived. Defendant said that Olga was threatening her and demanding money, and she asked Mrs. Diaz to help find a man to "get her out of town." Mrs. Diaz agreed to notify defendant if she found anyone. Later, after defendant had met Moya and Baldonado, she telephoned Mrs. Diaz and asked, "Becky, do you remember what we talked about?" Mrs. Diaz replied that she did, and defendant said, "Well, forget about it. I won't need you any more. It will be today or never."

On November 12, 1958, defendant went with Mrs. Short to the Tropical Café in Santa Barbara. Mrs. Esperanza Esquivel, who owned the café, and her husband had been charged with receiving stolen property, and Frank, as their attorney, had obtained a dismissal of the case against her and was seeking probation for her husband, who had pleaded guilty. Defendant told Mrs. Esquivel that Olga was blackmailing her and had threatened to throw acid in Frank's face, and she asked whether Mrs. Esquivel had any friends who would help "get rid" of Olga. Mrs. Esquivel replied that "there were some boys" but she did not know whether they would want to talk to defendant.

The next day defendant, accompanied by Mrs. Short, returned to the Tropical Café and was introduced to Moya and Baldonado by Mrs. Esquivel. Defendant told the men that her son was being blackmailed by Olga and said that she wanted to "get rid" of her. They discussed how much this would be worth to defendant and agreed that she would pay $3,000 when the "job" was done and $3,000 within three to six months. They considered several plans and finally decided that Moya and Baldonado would kidnap Olga, take her across the border and kill her in Tijuana. Moya said that he and Baldonado would need money for transportation, a weapon, and gloves. Defendant left for a while and on her return went to the kitchen with Moya where she paid him $175 she

had obtained by pawning some rings. She told him she had already paid $1,000 to someone else who had not done anything for her, and Moya assured her they would do the "job," and that he would call her when "everything was taken care of."

Moya and Baldonado hired a car from Mrs. Sara Contreras, borrowed a pistol from a friend, and purchased some ammunition, gloves, and adhesive tape. On the evening of November 17, 1958, they drove to Olga's apartment. When Olga came to the door, Moya told her that her husband was in the car, drunk, and asked for help, and she went with him to the car. Baldonado was then in the back seat pretending that he was Frank. When Olga opened the rear door, Moya hit her on the back of the head with the pistol and Baldonado pulled her into the car. On their way out of Santa Barbara, they drove to the beach, where they stopped because Olga was screaming and struggling. While Baldonado held her, Moya struck her on the head with the pistol, knocking her unconscious and breaking the handle of the gun. Baldonado then "tied her up" with the tape, and they continued on out of town.

A short time later they had trouble with the car, and, instead of following their original plan of going to Mexico, they drove into the mountains near Ojai, in Ventura County. They dragged Olga out of the car and down the side of a hill to a culvert that ran under the road. The pistol had been damaged so that it could not be fired, and Moya and Baldonado took turns strangling her. After a while they could not feel her pulse, and they dug a hole and buried her.

On returning to Santa Barbara, Moya and Baldonado hid their bloody clothes and the seat covers of the car. They tried to clean the car by sweeping it and spraying lacquer to hide blood spots. The next day they told Mrs. Contreras that the seat covers had been burned by a cigarette and that they would fix them or give her money for repairs.

Moya informed defendant by telephone that they had performed their "part of the bargain." She said that she had not been able to draw any money out of the bank because the police had been inquiring about Olga's disappearance. Defendant cashed a check which Frank had given her to pay for a typewriter, and she met Moya by appointment in a downtown store in Santa Barbara, where she handed him an envelope containing $150. Later, at defendant's request, Mrs. Short left an envelope for Moya with the cashier of a restaurant. The

envelope, which was addressed to "Dorothy," contained $10, and Moya obtained it by saying it was for his aunt.

During the period that she was making payments to Moya and Baldonado, defendant was questioned by Frank about the check he had given her to pay for a typewriter, and she told him she was being blackmailed. Frank informed the police and said that he was afraid defendant was involved in Olga's disappearance and was being blackmailed for that reason. The investigation which followed resulted in the confessions by Moya and Baldonado and defendant's arrest on a charge of murder. Olga's body was disinterred on December 21, and an autopsy surgeon found that Olga had been pregnant and that her death was caused by head wounds, strangulation, or suffocation such as would be produced by being buried alive.

Defendant took the stand in her own behalf and denied participating in the crime or making any of the solicitations testified to by the various prosecution witnesses. She admitted being in the Tropical Café on November 12 but claimed that she left after a social conversation with Mrs. Esquivel. She said that the following day she was walking past the café when Moya took her wrist and dragged her inside, where Mrs. Esquivel, in the presence of Moya and Baldonado, expressed dissatisfaction with Frank's legal services and demanded the return of the fee paid to him, threatening to kill him and defendant if the money was not returned. She asserted that the payments to Moya were made because of these threats.

■■■ The evidence is amply sufficient to support the jury's determination that defendant was guilty of murder in the first degree. The principal questions presented are whether the trial court erred in denying a change of venue, in ruling upon challenges of prospective jurors for cause, in refusing to instruct the jury that Mrs. Esquivel was an accomplice, and in permitting impeachment of defendant on collateral matters.

■■■ Defendant's motion for a change of venue from Ventura County was initially made and denied prior to the proceedings for the selection of a jury and was unsuccessfully renewed after the jury was selected but before it was sworn. In support of her motion she filed affidavits to the general effect that many persons in Ventura County had indicated a belief that defendant was guilty and had expressed the opinion that her right to a fair and impartial trial was prejudiced as a result of wide publicity given to the case and to statements made by public officials. The affidavits were accompanied by a

number of articles from newspapers circulated in the county which showed, among other things, that much of the testimony before the grand jury had been published in daily installments and that public officials, including the district attorney, had made statements to the press about the case while it was being investigated. One of the newspaper articles stated that at the time of arraignment there were about 1,000 persons in the courtroom and adjoining corridors, that many of the spectators were hostile to defendant, and that one of them attempted to strike her.

Defendant placed particular emphasis on newspaper reports of statements made by the district attorney during the investigation in the latter part of December, 1958. Before the indictment was returned, an article quoted the district attorney as saying, ''The brutal, calculated, revolting killing for hire of Olga Duncan is one of a number of horrible crimes which have recently been committed in California. . . . I simply can not understand how some of our leaders, in the face of these events, can seriously contend that the death penalty is not appropriate punishment for the perpetrators of such a crime.'' A few days after defendant was indicted, an article quoted the district attorney at length with respect to why he was going to ask for the imposition of the death penalty. Among his remarks were statements that the ''most pertinent point in the death penalty'' was retribution, that rehabilitation statistics were ''pretty sad,'' that the chances of rehabilitating the three persons charged with the crime were ''awfully slim,'' that he did not want to ''take that kind of chance,'' and that he did not have any qualms about the prospect of ''putting California's third woman in the gas chamber.'' Other statements which the district attorney was reported to have made were that he had evidence this was not the first time defendant sought to hire someone to kill Olga, that, as far as he was concerned, Moya and Baldonado were not blackmailing defendant but were demanding ''the pay they were promised for the job they did,'' and that defendant's jealousy of Olga was the major motive for the crime.[2]

In opposition to defendant's motion the district attorney filed affidavits averring that he was unaware of any person who had stated he could not act fairly and impartially as a

---

[2] In his oral argument before this court the district attorney denied making most of the statements attributed to him and said that he did not condone the making of such statements by a prosecuting official.

juror at the trial, and that in his opinion a fair trial could be had notwithstanding the publicity given to the case. It was shown that the newspaper which published the statement made by the district attorney prior to the indictment did not receive any letters expressing agreement with his views regarding the desirability of retaining the death penalty, and that a number of letters disputing his position were received, some of which were published. An affidavit by the undersheriff of Ventura County averred that no more than 200 persons were in the courtroom and the corridor at the time of arraignment, that he had made numerous inquiries about the asserted effort of a spectator to strike defendant, and that the only person whose name was given to him as having seen the incident was an investigator for defendant. It was also shown that there were approximately 170,000 people in Ventura County. The arrangements for the crime were made in Santa Barbara County, and neither the victim nor defendant lived in Ventura County.

A number of considerations thus militated against the conclusion that the publicity complained of had the effect of creating throughout the county a state of mind requiring a change of venue. Even if it be assumed that many persons formed opinions unfavorable to defendant as a result of what was published, it does not follow that persons without such views could not be found to act as jurors or that those who had adverse opinions would be unable to set them aside and try the case fairly on the basis of the evidence to be produced in court. (See Pen. Code, § 1076.) ▇▇▇ Defendant's motion for a change of venue was addressed to the sound discretion of the trial judge, and we cannot say that he abused his discretion in denying it. (See *People* v. *Burwell*, 44 Cal. 2d 16, 30 [279 P.2d 744].)

▇▇▇ The court disallowed challenges for actual bias made by defendant under section 1073 of the Penal Code to four prospective jurors (J. T. Porter, S. M. Flynn, Mrs. Susie Saavedra and Mrs. Erma Behrens).[3] These jurors were removed by peremptory challenges exercised by defendant, but later, before a jury was obtained, she exhausted the 20 peremptory challenges available to her, and she claims that she

---

[3] Section 1073 of the Penal Code provides: ''Particular causes of challenge are of two kinds: . . . Second. For the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, which is known in this code as actual bias.''

would have used such challenges, had they not been exhausted, to remove three jurors who tried the case, even though she did not challenge those jurors for cause. We have concluded that the court did not abuse its discretion in refusing to remove the four prospective jurors who were challenged for actual bias, and this makes it unnecessary for us to consider whether the rulings could have prejudiced defendant if they had been erroneous.

The statements made by the four challenged jurors on *voir dire* may be summarized as follows:

Juror Porter stated that as a result of reading newspapers, hearing radio and television broadcasts, and discussing the case with 15 or 20 people, he had formed an opinion unfavorable to defendant regarding her guilt. He did not know if the people with whom he talked had personal knowledge of the case, but he was "sure they didn't or they would have said so." In response to questions by defense counsel, he said that evidence would be required to overcome his opinion, and in the absence of evidence he would not want his wife to be tried by jurors with his present frame of mind and did not think she would receive a fair and impartial verdict from such jurors. In response to questions by the district attorney and the court, he stated that he would follow an instruction by the court to disregard what he had read and heard, and he would base his verdict solely upon the evidence presented in court. He would also follow an instruction that in order to convict defendant he must be persuaded of her guilt by the evidence beyond a reasonable doubt. He said further that he would act fairly and impartially, and on the presentation of evidence he would be satisfied to have himself or his wife tried by a juror with his frame of mind.

Juror Flynn said that he had formed an opinion adverse to defendant concerning her guilt as a result of reading newspaper articles, hearing radio and television broadcasts, and discussing the case with many people. He did not know whether the people with whom he talked had personal knowledge of the case; he thought they were relating what they had read. In response to questions by defense counsel he said that evidence would be required to overcome his opinion, and, if his wife were on trial, he would not be willing to trust her fate to 12 jurors with his present frame of mind and did not think such jurors could render a fair and impartial verdict. He stated, however, that he felt he could completely set aside his opinion, that it would not have a tendency to influence

his verdict, and that it would not prevent him from acting fairly and impartially. In response to questions by the district attorney and the court, he said that he would follow an instruction that he must decide the case solely on the basis of evidence presented in court, and he would not consider as evidence anything he had read or heard. He further stated he would require the district attorney to establish defendant's guilt beyond a reasonable doubt, would act fairly and impartially, and would be willing to have jurors with his frame of mind try himself or a member of his family.

Juror Saavedra stated that, as a result of reading newspapers and talking about the case with her family, she had formed an opinion as to guilt unfavorable to defendant. In response to questions by defense counsel she said that evidence would be required to overcome her opinion, that she did not know whether she could set aside her opinion completely, that she did not feel jurors with her present frame of mind could act impartially, and that, assuming she served as a juror and after hearing the evidence she entertained a reasonable doubt as to defendant's guilt, she would have some hesitancy in resolving the doubt in defendant's favor even though the court told her it was her duty to do so. In response to questions by the district attorney and the court she said that if she served on the jury she would set aside her opinion entirely and base her verdict solely upon the evidence presented in court, that she would follow an instruction not to vote defendant guilty unless convinced by the evidence beyond a reasonable doubt, and that she would be fair and impartial and would be willing to be tried by jurors with her frame of mind.

Juror Behrens stated that she had formed an opinion that defendant was guilty from reading newspapers and discussing the case with quite a few people including persons who came into the cleaning establishment where she was employed. She did not believe or disbelieve what any of them said. In response to questions by defense counsel she stated that evidence would be required to overcome her opinion, and she did not know whether her opinion would influence her verdict but felt it would prevent her from acting fairly and impartially. She would not want to trust her fate or that of a loved one to 12 jurors with her present frame of mind and did not feel such jurors could return an absolutely fair and impartial verdict. In response to questions by the district attorney she said her frame of mind was such that, for purposes of voting a verdict, she would set aside her opinion and decide the case

solely upon the basis of the evidence and instructions of the court. She would follow an instruction that guilt must be proved beyond a reasonable doubt before defendant could be convicted, and she would act fairly and impartially notwithstanding her opinion. She also stated that she would be satisfied to have someone near and dear to her tried by jurors who, like herself, could and would set aside their opinions and decide the case solely upon the evidence and the instructions of the court.

Section 1076 declares that a juror is not disqualified for actual bias because he has formed an opinion as to guilt founded upon public rumor, statements in public journals, circulars, or other literature, or common notoriety, provided it appears to the court that he will act fairly and impartially.[4] This statute was obviously enacted in recognition of the fact that some cases are given widespread publicity in advance of trial and that persons who may be called upon to act as jurors may read or hear what is reported, discuss the subject with others, and even form opinions as to the guilt of the accused. The statements of the four challenged jurors show that their opinions were based upon information obtained from newspapers, radio, or television and upon discussions with various people. There is nothing in the record to suggest that anyone with whom they talked had personal knowledge regarding the case, and their statements indicated they did not understand that these people had such knowledge. The crime was obviously a topic of conversation by the public generally, and such cases are usually discussed upon the basis of news reports and rumor. Only a few people speak from personal knowledge, and, when they do, that fact is almost invariably made clear. The trial court could conclude that the comments made by the persons with whom the four jurors discussed the case were founded on news reports or rumor.

When the jurors were questioned by defense counsel, they answered that they had formed an opinion defendant was

---

[4]Section 1076 of the Penal Code provides in part: " . . . In a challenge for actual bias, the cause stated in the second subdivision of section one thousand seventy-three must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals, circulars, or other literature, or common notoriety; provided, it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him. . . ."

guilty and that it would require evidence to overcome their opinion. As we have seen, however, the opinions were based on news reports and rumor, and, when questioned by the district attorney and the judge, the jurors stated that they would base their verdict solely on the evidence received in court and the instructions given them and that they would act impartially notwithstanding the opinions they had formed. Where jurors on *voir dire* have made conflicting statements similar to those involved here, it is a question of fact for the trial judge whether they can act impartially, and in such circumstances rulings denying challenges for bias have uniformly been upheld in this state as well as by the United States Supreme Court. (*People* v. *Daugherty,* 40 Cal.2d 876, 889-890 [256 P.2d 911] ; *People* v. *Wallace,* 6 Cal.2d 759, 764-765 [59 P.2d 115] ; *People* v. *Edwards,* 163 Cal. 752, 756-757 [127 P. 58] ; *People* v. *Loper,* 159 Cal. 6, 10-11 [112 P. 720, Ann.Cas. 1912B 1193] ; *People* v. *Scott,* 123 Cal. 434, 435 [56 P. 102] ; *cf. Holt* v. *United States,* 218 U.S. 245, 248 [31 S.Ct. 2, 54 L.Ed. 1021] ; *Spies* v. *Illinois,* 123 U.S. 131, 170 et seq. [8 S.Ct. 21, 31 L.Ed. 80].) The record supports the conclusion of the trial judge that the four challenged jurors would be fair and impartial.

The trial court did not abuse its discretion in removing jurors Sechrest and Gisler, who were challenged by the district attorney when they stated that they did not believe in capital punishment. (Pen. Code, § 1074, subd. 8; *People* v. *Riser,* 47 Cal.2d 566, 573-576 [305 P.2d 1].)

The trial court refused to give an instruction requested by defendant that Mrs. Esquivel was an accomplice. Instead, the jury was instructed as to what constitutes an accomplice and what corroboration is required of an accomplice's testimony, and it was told that whether or not any witness other than Moya and Baldonado was an accomplice was for the jury to determine from all the testimony and the circumstances as shown by the evidence. An accomplice is one "who is liable to prosecution for the identical offense charged against the defendant." (Pen. Code, § 1111.) In order to come within this definition a person must have guilty knowledge and intent with regard to the commission of the crime. (*Cf. People* v. *Lima,* 25 Cal.2d 573, 576-578 [154 P.2d 698] ; *People* v. *Shaw,* 17 Cal.2d 778, 799-800 [112 P.2d 241].) The requested instruction that Mrs. Esquivel was an accomplice could properly be given only if undisputed evidence established the complicity. (*People* v.

*Davis,* 43 Cal.2d 661, 672 [276 P.2d 801]; *People* v. *Barclay,*
40 Cal.2d 146, 151-153 [252 P.2d 321].)

Mrs. Esquivel testified that when defendant asked her if
she had friends who would help ''get rid'' of Olga she replied
that ''there were some boys'' but she did not know if they
would talk to defendant. She told Moya and Baldonado that
defendant wanted to see them about ''a job'' and subsequently
introduced her to them. She also testified that she did not
believe defendant wished to find someone who would ''get
rid'' of Olga and that she did not want Moya and Baldonado
to ''do that kind of a job.'' She told them they could talk
to defendant or not as they pleased, and she did not tell them
defendant wanted them to ''get rid'' of Olga. Thus it was a
question of fact whether she had the guilty knowledge and
intent necessary to make her an accomplice, and the trial court
did not err in refusing to instruct the jury as a matter of
law that she was an accomplice.

Defendant testified on direct examination that she
was married at one time to F. M. Lowe and later to F. P.
Duncan. She testified further that her daughter, Patricia, was
the issue of her marriage to Duncan and that her son, Frank,
who was the issue of her marriage to Lowe, changed his name
to Duncan. The district attorney, over objection, sought to
show by his questioning of defendant that at the time of her
marriage to Lowe three prior marriages had not been dissolved
and that the Lowe marriage had not been terminated when
she married Duncan. The People were also permitted, over
objection, to introduce court records which showed that de-
fendant had defaulted in an annulment action brought by
Duncan against her and had thus failed to deny an allegation
of the complaint that she was the wife of another when she
married Duncan.

The legality of defendant's marriages to Lowe and Duncan
was not relevant to any issue in the case, and attacking the
credibility of defendant on the point was of little, if any,
importance to the prosecution. On the other hand, the ques-
tioning by the district attorney had an obvious tendency to
degrade defendant since it injected into the case insinuations
that she had committed bigamy and adultery and was the
mother of two illegitimate children. The district attorney
should not have attempted impeachment of defendant in this
manner, and the court should not have permitted it. How-
ever, defendant's answers to the questions were favorable to
her and tended to minimize any harmful effect. She testified

that she had not entered into one of the three alleged prior marriages, that the two others had been terminated when she married Lowe, that he divorced her before she married Duncan, and that her default in the annulment action brought by Duncan was due to a lack of interest in him.

The district attorney was also permitted to question defendant, over objection, as to whether Frank had made his home with her during her marriage to several men. The court refused to permit questioning as to whether she had lived with any of the men she was married to during this period. The district attorney was further allowed, over objection, to cross-examine defendant as to whether she had previously lied about her age. On his motion all questions and answers on these subjects were stricken from the record, and the jury was instructed to disregard them. Defendant contends that these questions tended to degrade and debase her and that the error was not cured by the admonition of the court. Although it is not always possible to cure error in this manner, for example, where the objectionable evidence goes to the main issue and the proof of guilt is not clear and convincing, the jury, under ordinary circumstances, is presumed to obey the court's instructions and disregard the evidence. (*People* v. *Hardy,* 33 Cal.2d 52, 61-62 [198 P.2d 865].) Even if we accept defendant's contentions that the evidence objected to was inadmissible, it is clear that it did not go to the main issue in the case, and we must assume that the jury obeyed the court's instructions to disregard it.

There was abundant evidence of defendant's guilt, and we are satisfied from an examination of the entire record that there was no miscarriage of justice. (Cal. Const., art. VI, § 4½.)

The judgment and the order denying a new trial are affirmed.

Traynor, J., Schauer, J., Spence, J., McComb, J., Peters, J., and White, J., concurred.

Appellant's petition for a rehearing was denied April 5, 1960.