168 Cal.App.4th 972 (2008)
THE PEOPLE, Plaintiff and Respondent,
v.
EDGARDO RODRIGUEZ, Defendant and Appellant.
No. A114910.
Court of Appeals of California, First District, Division Five.
November 26, 2008.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*975 Cynthia A. Thomas for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
REARDON, J.[*]
Following a jury trial, defendant Edgardo Rodriguez (defendant) was convicted of first degree murder, as well as related offenses, special circumstances, and enhancement allegations. On appeal, defendant contends that the trial court erred by (1) admitting evidence of defendant's involvement in a prior shooting, (2) failing to give proper instructions on *976 accomplice testimony, and (3) failing to limit the testimony of a police officer who testified as an expert on criminal street gangs. We affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

A. The Charges Against Defendant

The charges against defendant arose from a September 16, 2003 shooting in which Francisco Javier Sanchez was killed and Osvaldo Ramirez was injured. Charges initially were brought in a criminal complaint filed on September 18, 2003. Count one of the complaint charged defendant with the first degree murder of Sanchez and alleged special circumstances and enhancement allegations. Count two charged defendant and three othersBryan Giddings, Manuel Robles, and Omar Anwar (the codefendants or the witnesses)with shooting at an occupied motor vehicle. Count two alleged, as to all four defendants, that the offense was committed for the benefit of a criminal street gang.
All of the defendants initially pled not guilty. However, Giddings, Robles, and Anwar later entered pleas of no contest or guilty to aiding and abetting an assault by defendant with a semiautomatic firearm in violation of Penal Code[1] section 245, subdivision (b), which the prosecutor stated was a "stipulated lesser-related" offense to the charged offense of shooting at an occupied motor vehicle.[2] As part of their plea agreements, they agreed to testify.
On November 10, 2004, defendant was charged by information with (1) the first degree murder of Sanchez (count one; § 187, subd. (a)), (2) shooting at an occupied motor vehicle (count two; § 246), (3) the attempted murder of Ramirez (count three; §§ 187, subd. (a), 664), and (4) dissuading a witness by force or threat, based on an alleged threat against Anwar (count four; § 136.1, subd. (c)(1)). In connection with count one, the information alleged as special circumstances that the murder of Sanchez was intentional and perpetrated by means of shooting from a motor vehicle (§ 190.2, subd. (a)(21)), and that defendant committed the murder while he was an active participant in a criminal street gang for the purpose of furthering the activities of the gang (§ 190.2, subd. (a)(22)). The information also included special allegations that all four crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that, as to the first three counts, defendant *977 personally discharged a firearm causing great bodily injury and/or death (§ 12022.53, subd. (d)), and personally inflicted great bodily injury (§ 12022.7, subd. (a)).[3]
Defendant pled not guilty to all charges and denied the special allegations.

B. The Evidence Presented at Trial

1. The Shooting

On the afternoon of September 16, 2003, Sanchez was driving his brother's red or maroon car on Mission Boulevard in Hayward, with his friend Ramirez seated in the front passenger seat. Sanchez and Ramirez, who were members of the Laborers Union, had just paid their union dues at a union hall on Mission and were driving toward a supermarket. Sanchez and Ramirez were not involved in gang activity. Sanchez stopped at a red light at the intersection of Mission and Industrial. A white minivan stopped in the left turn lane next to the driver's side of Sanchez's car. Ramirez later identified a photograph of Bryan Giddings's white minivan as the van that stopped next to Sanchez's car. Ramirez testified that a man got out of the back of the van and reached his hand into the driver's side window of Sanchez's car. Ramirez then heard several gunshots. After the first shot, Ramirez felt pain in his leg and ducked down. Sanchez's car rolled forward into the intersection and came to a stop. When Ramirez looked up, he saw that Sanchez was bleeding and had several wounds, including a head wound. Sanchez died of bullet wounds to his head, left shoulder, and right forearm.
Stephanie Koller and her teenage son Kyle were driving on Mission and stopped at the intersection of Industrial about 3:00 p.m. on September 16, 2003, in the same southbound lane as Sanchez's car, and two cars behind it. Stephanie saw the white minivan pass her car and stop in the left turn lane next to Sanchez's car. Stephanie then saw a man get out of the van, approach Sanchez's car, and throw two punches at the driver through the open driver's side window. Kyle also saw the man standing in the street between the white minivan and the maroon car. Kyle then saw a man's right hand and arm come out of the open front passenger's side window of the white minivan, holding a gun that Kyle recognized as a semiautomatic weapon. The man holding the gun pointed it at the driver's side of the maroon car and fired six or seven shots. Stephanie also heard several gunshots. Based on the skin color of the *978 shooter's arm, Kyle believed the shooter was Hispanic. Kyle believed that the man holding the gun out of the window was not the driver of the van, because the driver would not be able to lean over far enough to stick his forearm out of the passenger side window.
Kyle and Stephanie testified that, when the gunshots began, the man standing in the street between the van and Sanchez's car appeared to be startled by the shots. The man in the street jumped back, put his hands in front of his face and turned his head as if he were trying to get out of the way. When the shooting stopped, the white van began making a U-turn on Mission, stopped briefly to let the man in the street run to get into the van, and then continued the U-turn and drove away northbound on Mission. When the van stopped in the middle of its U-turn to let the man in the street get in, Kyle and Stephanie saw the driver of the van. Kyle also noticed the first digit of the van's license plate number. Stephanie called her husband, a Hayward police officer, and gave descriptions of the driver of the van and the man who got out of the van and threw punches at Sanchez. At trial, Stephanie and Kyle both identified Giddings's white minivan as the van involved in the shooting.
The parties stipulated that Ranil Bhukhan, if called as a witness, would testify that he was driving on Mission at the intersection of Industrial on September 16, 2003, at approximately 3:00 p.m., witnessed a shooting, saw a white van make a U-turn, and wrote down the van's license plate number on a paper bag. The number Bhukhan wrote down was the license plate number of Giddings's van.
Giddings, Robles, and Anwar testified that, on September 16, 2003, they were gang members. Giddings was involved with the VSH (Vario South Hayward) and DGF (Don't Give a Fuck) gangs, which are affiliated with the South Side Hayward gang, which in turn is a Norteno gang. Robles and Anwar were DGF gang members. Giddings, Robles, and Anwar testified that defendant was also a DGF gang member on September 16, 2003. Members of Norteno gangs such as South Side Hayward and DGF view Sureno gangs as their enemies and will attack persons they believe to be Sureno gang members. Norteno gang members use the derogatory term "Scraps" to refer to Sureno gang members.
On September 16, 2003, Giddings drove his white minivan, with defendant seated in the front passenger seat, to pick up Robles. Robles testified that, when Giddings and defendant picked him up at his mother's home, Giddings was driving, defendant was seated in the front passenger seat, and Robles got into the back seat.
*979 Robles's sister, Anna Robles Ramirez (Anna), testified that at around 2:30 p.m. on September 16, 2003, Giddings and defendant arrived at Anna's mother's home (where Anna was then living) in Giddings's van. Anna saw Robles get into the rear sliding door of the van and, as the van pulled away, she saw that Giddings was driving and defendant was seated in the front passenger seat.
Giddings next drove the van to an area called Ranker Court and picked up Anwar, who got into the back seat of the van. The group drove around for a while listening to music, drinking beer, and smoking marijuana, and then arrived at the intersection of Mission and Industrial. During the drive, the group talked about problems they had been having recently with "Scraps" and spoke about wanting to beat up or "smash" a "Scrap." Giddings testified that, during this conversation, defendant said "I want to get me a Scrap." Giddings testified that, prior to arriving at Mission and Industrial, he was not aware that anyone in the van had a gun, although he always assumed it was possible that one of his fellow gang members might have a gun. Anwar testified that he was not aware that defendant had a gun before the van arrived at Mission and Industrial. Robles had seen a gun in defendant's pocket earlier in the day.
The three codefendants all testified that, when the van arrived at Mission and Industrial, Giddings was driving, defendant was in the front passenger seat, Robles was in the back seat behind Giddings, and Anwar was in the back seat behind defendant. Giddings stopped at the red light in the lane to the left of the maroon car driven by Sanchez. The occupants of the van noticed that there were two young Hispanic men in the car and that the driver (Sanchez) was wearing a baby blue University of North Carolina baseball cap. Surenos claim the color blue, and Nortenos claim the color red.
Giddings and Anwar testified that defendant said "There goes a Scrap" or something similar. Defendant told Anwar to get out of the van and confront or punch the driver of the maroon car. Anwar testified that when defendant told him to get out of the van, defendant had taken out a gun and was waving it at Anwar. Giddings, Robles, and Anwar testified that they did not believe the men in the maroon car were Surenos, because they did not present themselves the way gang members do, and because the driver (Sanchez) smiled at Giddings. However, Anwar got out of the van, approached the maroon car, and said "No Sureno." When Sanchez did not respond, Anwar threw a punch at Sanchez but missed. Sanchez did not fight back and appeared to not know how to react. Giddings started yelling at Anwar to get back in the van.
*980 The three codefendants testified that defendant then started shooting at the driver of the maroon car. Robles ducked down onto the floor of the van. Anwar was startled by the gunshots, moved back and put his hands up near his face. Giddings was afraid of being caught and yelled at defendant, "What the fuck you doing? What you doing, doing that shit right here for?" Giddings began making a U-turn to leave the scene, but defendant told him to stop and wait for Anwar to get back in the van. Defendant yelled at Giddings, saying "Stop, stop. Wait for [Anwar] to get in. Don't fuck up now." By then, defendant had the gun on his lap pointing in Giddings's direction. Giddings stopped the van; Anwar got in; and Giddings drove away.
Giddings drove the van to defendant's apartment, where the group stayed for between a half hour and 45 minutes. Defendant showered and changed his clothes, and Anwar changed his shirt. One or more of the men suggested that defendant urinate on his hands to remove the gunpowder residue. At the apartment, Anwar saw the gun that defendant apparently had used.
The group left the apartment in Giddings's van. This time, Robles drove; Giddings sat in the front passenger seat; Anwar sat in the back seat behind the driver; and defendant sat in the rear, passenger side seat.

2. The Arrest

The police had been given a description and license plate number of the van and were looking for it. Hayward Police Lieutenant Thomas Perry spotted the van and began following it, and Robles pulled the van into the parking lot of a pizza restaurant. Other officers arrived and arrested the four occupants of the van.
Stephanie and Kyle Koller arrived at the scene of the arrest and identified Giddings as the driver of the van at the time of the shooting and Anwar as the man who was standing in the street between the van and Sanchez's car.
Officer Donald Jenkins obtained identifying information from defendant at the scene. A crowd of spectators had gathered. Officer Jenkins noticed a group of eight to ten Hispanic males, two of whom Jenkins recognized as gang members, standing together and looking at the suspects who were being arrested. Jenkins pointed out the group to other officers, and the group then ran behind a building.

3. The Search of Defendant's Apartment

On the day after the shooting, police officers, including Inspector Robert Coffey, searched defendant's apartment pursuant to a warrant. A window next *981 to the door of the apartment had been broken. Clothing and other items were strewn around the apartment, and there was no bedding on the bed. Based on his observations, Inspector Coffey opined that someone had broken the window and entered and ransacked the apartment. In the apartment police found a box of .22-caliber long rifle ammunition, 13 rounds of .38-caliber ammunition, and an empty box of Winchester brand nine-millimeter Luger ammunition. Police also found several items of red clothing in the apartment, the color claimed by Norteno gang members.

4. Ballistics Evidence

Joseph Fabiny, a firearms expert, testified that he tested the six shell casings found at the scene of the shooting. The casings included four Winchester brand nine-millimeter Luger casings, one Speer brand nine-millimeter Luger casing, and one PMC brand nine-millimeter Luger casing, all of which had been fired from the same gun.
Defendant did not testify and called no witnesses.

C. The Jury's Verdict and Sentencing

On April 3, 2006, the jury found defendant guilty of first degree murder, shooting at an occupied vehicle, and attempted murder (counts one, two, and three). The jury also found true the special circumstances as to count one and all enhancement allegations relating to counts one, two, and three. The jury was unable to reach a verdict on count four, witness intimidation, and the trial court declared a mistrial on that count.
On August 9, 2006, the trial court sentenced defendant to life imprisonment without the possibility of parole on count one, plus additional consecutive terms for the count three conviction and certain of the enhancement allegations. The court stayed the sentence on count two pursuant to section 654.
Defendant filed a timely notice of appeal.

II. DISCUSSION

A. The Meekland Shooting[*]

*982 B. Jury Instructions on Accomplice Testimony

1. Background

Defendant requested that the trial court instruct the jury (pursuant to CALCRIM No. 335) that Giddings, Robles, and Anwar were as a matter of law accomplices whose testimony required corroboration. The trial court declined this request, ruling that the accomplice status of the three witnesses was a disputed factual issue to be resolved by the jury. The court ruled that it would instruct the jury on this issue using CALCRIM No. 334, which explains in substance that a witness is an accomplice to a crime if he personally commits the crime or aids and abets its commission, i.e., aids in the commission of the crime with knowledge of "the criminal purpose of the person who committed the crime."
Defendant argued that, if the trial court submitted the accomplice question to the jury, it should supplement CALCRIM No. 334 with an instruction explaining the "natural and probable consequences" doctrine of aiding and abetting liability. Defendant submitted a proposed instruction (based on CALCRIM No. 402) stating that the three codefendants had pled guilty or no contest to assault with a semiautomatic firearm and that, if the crimes charged against defendant were natural and probable consequences of that assault, then the three witnesses were accomplices to the charged crimes. In addition to submitting this specific instruction, defendant argued generally that "some natural and probable consequences doctrine instruction" should be given to the jury as part of the court's instructions on accomplice testimony. The trial court declined defendant's request and stated that neither CALCRIM No. 402 nor defendant's modified version of it was necessary.

2. Analysis

On appeal, defendant contends that the trial court erred by refusing to instruct the jury that Giddings, Robles, and Anwar were accomplices as a matter of law. Because the parties' briefing on that issue raised the applicability of the natural and probable consequences doctrine, we requested supplemental briefing on the question of whether the trial court was obligated to instruct the jury on that doctrine as part of its instructions on accomplice testimony. We also asked the parties to address whether the guilty and no contest pleas entered by the codefendants were relevant to the accomplice issue. We hold that the trial court correctly declined to instruct that the witnesses were accomplices as a matter of law. We hold that the trial court *983 erred by failing to instruct the jury on the natural and probable consequences doctrine but that the error was harmless.

a. The Accomplice as a Matter of Law Instruction

(1) Section 1111 provides that a defendant cannot be convicted of a crime on the basis of an accomplice's testimony unless that testimony is corroborated by other evidence connecting the defendant with the commission of the charged offense. (§ 1111.) An accomplice is a person "who is liable to prosecution for the identical offense charged against the defendant on trial...." (Ibid.) This definition encompasses all persons who are "principals" to the charged crime, including perpetrators and aiders and abettors, but does not include persons who are merely accessories. (People v. Fauber (1992) 2 Cal.4th 792, 833-834 [9 Cal.Rptr.2d 24, 831 P.2d 249] (Fauber); People v. Stankewitz (1990) 51 Cal.3d 72, 90 [270 Cal.Rptr. 817, 793 P.2d 23] (Stankewitz).) Whether a witness is an accomplice is a question of fact for the jury "unless there is no dispute as to either the facts or the inferences to be drawn therefrom." (People v. Garrison (1989) 47 Cal.3d 746, 772 [254 Cal.Rptr. 257, 765 P.2d 419] (Garrison); accord, People v. Rodriguez (1986) 42 Cal.3d 730, 759 [230 Cal.Rptr. 667, 726 P.2d 113].) The defendant has the burden to prove by a preponderance of the evidence that a witness is an accomplice. (Fauber, supra, 2 Cal.4th at p. 834; People v. Tewksbury (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335] (Tewksbury).)
(2) The trial court properly declined to instruct the jury as a matter of law that Giddings, Robles, and Anwar were accomplices. There were factual disputes as to whether they aided and abetted the "identical" offenses charged against defendant, i.e., the murder of Sanchez, shooting at an occupied motor vehicle, and the attempted murder of Osvaldo Ramirez. (See § 1111.) (3) In general, a person is liable as an aider and abettor if he or she (1) has knowledge of the unlawful purpose of the perpetrator, (2) intends to assist the perpetrator in the commission of the crime, and (3) does assist in the commission of the crime. (People v. Prettyman (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013] (Prettyman); People v. Beeman (1984) 35 Cal.3d 547, 560-561 [199 Cal.Rptr. 60, 674 P.2d 1318].) In addition, under the "natural and probable consequences" doctrine, a person who aids and abets a crime (the target crime) is also liable for any other crime (the nontarget crime) that was a natural and probable consequence of the target crime. (Prettyman, supra, 14 Cal.4th at pp. 260-262.) Here, the evidence did *984 not establish as a matter of law that the three witnesses aided and abetted the charged crimes, either directly or under the natural and probable consequences doctrine.[8]
First, as to direct aiding and abetting of the charged crimes, the evidence did not establish as a matter of law that the witnesses had the requisite "`"guilty knowledge and intent"'" (Fauber, supra, 2 Cal.4th at p. 834, quoting Tewksbury, supra, 15 Cal.3d at p. 960, quoting People v. Duncan (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103]), i.e., that they knew of defendant's purpose to commit the charged crimes or intended to assist him in the commission of those crimes. (See Prettyman, supra, 14 Cal.4th at p. 259.) To the contrary, the testimony of the witnesses supports a conclusion that they did not know of defendant's purpose. Giddings, the driver of the van, was frightened and angry and yelled at defendant. Anwar, who was outside the van next to Sanchez's car, was startled by the gunshots, moved back and put his hands up to his face. Robles ducked down onto the floor of the van. In addition, both Giddings and Anwar testified that, prior to arriving at Mission and Industrial, they were not aware that defendant had a gun.[9]
In Garrison, on which the trial court relied, the key prosecution witness was present during the defendant's commission of burglary, robbery, and murder, but denied harboring the intent to facilitate the crimes. (People v. Garrison, supra, 47 Cal.3d at pp. 761, 772.) The Supreme Court held that the trial court "could not have instructed that [the witness] was an accomplice as a matter of law without offering to the jury the court's belief that the witness had given false testimony." (Id. at p. 772.) Similarly, here, if the trial court had instructed the jury that the witnesses were accomplices as a matter of law, it would have been tantamount to instructing the jury that the witnesses' testimony about the incident and their reactions to it was false.
Other evidence, although relevant to the jury's determination of the accomplice question, did not establish as a matter of law that Giddings, Robles, and Anwar aided and abetted the charged crimes. Evidence that the witnesses were present at the scene of the shooting and failed to prevent it does not establish aiding and abetting liability. (Stankewitz, supra, 51 Cal.3d at p. 90.) Evidence that the witnesses assisted in defendant's efforts to escape *985 would only support their liability as accessories, rather than principals, and would not establish their accomplice status. (People v. Hoover (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760].) The fact that the witnesses were originally prosecuted for one of the same offenses as defendant (shooting at an occupied motor vehicle) also does not establish that they were accomplices. (Garrison, supra, 47 Cal.3d at p. 772; Tewksbury, supra, 15 Cal.3d at pp. 962-963.) Finally, the witnesses' guilty and no contest pleas to aiding and abetting an assault with a semiautomatic firearm, although relevant, do not establish as a matter of law their liability for the crimes with which defendant was charged. (People v. Chavez (1985) 39 Cal.3d 823, 830 [218 Cal.Rptr. 49, 705 P.2d 372] [witness's guilty plea to being an accessory in connection with murder and robbery charged against defendant was relevant to accomplice issue but did not establish accomplice status as a matter of law]; People v. Martinez (1982) 132 Cal.App.3d 119, 130 [183 Cal.Rptr. 256] [witness pled guilty to one count of robbery after being arrested and charged with same robberies for which defendant was tried; plea did not, in and of itself, establish his status as an accomplice].)
Second, defendant contends that the witnesses were accomplices as a matter of law under the natural and probable consequences doctrine. Defendant argues that the witnesses aided and abetted a target crime (either assault with a semiautomatic firearm, as reflected in their pleas, or Anwar's unarmed assault on Sanchez), and that the charged crimes were the natural and probable consequences of the target crime(s).
(4) Although the natural and probable consequences doctrine provides an alternative avenue for defendant to seek to prove that the three witnesses were accomplices, it does not convert the accomplice issue from a question of fact to a question of law. Whether a particular criminal act (a nontarget crime) was a natural and probable consequence of another criminal act (the target crime) is a factual question to be resolved by the jury. (See People v. Rodriguez, supra, 42 Cal.3d at p. 760, citing People v. Durham (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198]; People v. Nguyen (1993) 21 Cal.App.4th 518, 531 [26 Cal.Rptr.2d 323].) The issue for the jury is "whether, under all of the circumstances presented, a reasonable person in the [alleged accomplice's] position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the [alleged accomplice]." (People v. Nguyen, supra, 21 Cal.App.4th at p. 531.) Accordingly, even if it were conclusively established that one or more of the witnesses aided and abetted a target crime, the jury, not the trial court, would need to determine whether the crimes charged against defendant were natural and probable consequences of the alleged target offenses.
*986 Defendant argues that, under the natural and probable consequences doctrine, Giddings, Robles, and Anwar were guilty of murder and the other charged crimes because they knew that any gang-related confrontation could escalate into violence, especially in light of the Meekland shooting a few days earlier. Defendant notes that, in People v. Gonzales (2001) 87 Cal.App.4th 1 [104 Cal.Rptr.2d 247], and People v. Montes (1999) 74 Cal.App.4th 1050 [88 Cal.Rptr.2d 482], the courts held that, when one of the participants in a gang-related confrontation used a gun to commit murder or attempted murder, his companions could be liable for those crimes under the natural and probable consequences doctrine even if they were not aware that their codefendant intended to use a gun. (People v. Gonzales, supra, 87 Cal.App.4th at pp. 9-10; People v. Montes, supra, 74 Cal.App.4th at pp. 1054-1056.) However, in those cases, the appellate courts held only that the gang-related nature of the assaults provided a basis for the jury to conclude that the defendants were liable under the natural and probable consequences doctrine. (People v. Gonzales, supra, 87 Cal.App.4th at pp. 9-10 [there was sufficient evidence from which jury "could" conclude that nontarget crime was reasonably foreseeable]; People v. Montes, supra, 74 Cal.App.4th at pp. 1054-1056 [trial court properly instructed jury it could find defendants guilty under natural and probable consequences doctrine].) Neither case purported to alter the rule that the jury, not the trial court, must determine whether one criminal act is a natural and probable consequence of another. (See People v. Rodriguez, supra, 42 Cal.3d at p. 760; People v. Nguyen, supra, 21 Cal.App.4th at p. 531.) We next address whether the trial court provided the jury with adequate instructions to make that determination.

b. Instruction on the Natural and Probable Consequences Doctrine

(5) In general, if there is sufficient evidence that a witness is an accomplice, the trial court has a sua sponte obligation to instruct the jury on "the principles governing the law of accomplices," including the definition of an accomplice and the rule that accomplice testimony requires corroboration. (People v. Frye (1998) 18 Cal.4th 894, 965-966 [77 Cal.Rptr.2d 25, 959 P.2d 183]; People v. Gordon (1973) 10 Cal.3d 460, 469-470 [110 Cal.Rptr. 906, 516 P.2d 298], disapproved on another point in People v. Ward (2005) 36 Cal.4th 186, 212 [30 Cal.Rptr.3d 464, 114 P.3d 717].) As the Attorney General notes, if the trial court gives standard, correct instructions on accomplice liability, and no party objects or requests additional instructions, the court does not have a sua sponte duty to give additional instructions that clarify or add to the standard instructions. (E.g., People v. Guiuan (1998) 18 Cal.4th 558, 569-570 [76 Cal.Rptr.2d 239, 957 P.2d 928]; People v. Lawley (2002) 27 Cal.4th 102, 160-161 [115 Cal.Rptr.2d 614, 38 P.3d 461].)
*987 (6) As to the natural and probable consequences doctrine, the Supreme Court has held that, when the prosecution relies on that doctrine in proving a defendant's guilt, the court has a sua sponte duty to instruct on the doctrine and the elements of the target offense or offenses. (Prettyman, supra, 14 Cal.4th at pp. 268-269.) However, this duty only arises when, and only to the extent, there is sufficient evidence to support these instructions. (Ibid.)[10] Thus, when a theory of a defendant's guilt is presented to the jury, the court must fully instruct on that theory to the extent the evidence would support the theory.
Here, the prosecution did not rely upon the natural and probable consequences doctrine to prove defendant's guilt. Indeed, the prosecution's theory was that defendant was the actual perpetrator, not an aider and abettor. Thus, the rule of Prettyman is not directly applicable. However, the prosecution did rely upon the testimony of potential accomplices to prove defendant's guilt. As noted already, when such is the case, the court is required to instruct the jury on the definition of an accomplice and on the rule that an accomplice's testimony must be corroborated. (People v. Frye, supra, 18 Cal.4th at pp. 965-966; People v. Gordon, supra, 10 Cal.3d at pp. 469-470.) Here, the court explained the corroboration requirement and instructed the jury that it was to determine whether the relevant witnesses were or were not accomplices. However, the court did not explain that the witnesses would be accomplices if they aided and abetted the committed crime or if they aided and abetted a target crime of which the committed crime was a natural and probable consequence. Thus, the full extent of the witnesses' potential accomplice liability was not explained to the jury.
(7) The court in People v. Gonzalez (2002) 99 Cal.App.4th 475 [121 Cal.Rptr.2d 279] (Gonzalez), considered a similar situation. In that case, there was evidence that a witness had aided and abetted the defendant in the assault upon and ultimate death of a rival gang member. (Gonzalez, supra, 99 Cal.App.4th at pp. 481-483.) That situation, like the one before us, presents the possibility that the jury could believe the witness intended an assault but not necessarily a murder. If, under the circumstances, the murder was a natural and probable consequence of the assault, the witness would nonetheless be an accomplice whose testimony would require corroboration. (See Prettyman, supra, 14 Cal.4th at pp. 260-262.) The jury in Gonzalez was instructed on the requirement of corroboration and on the basic rule of accomplice liability. (Gonzalez, supra, 99 Cal.App.4th at pp. 481-482.) *988 However, no party requested instructions on the natural and probable consequences doctrine, and the trial court gave no such instructions. (Id. at pp. 482-483.) Relying on Prettyman, the majority in Gonzalez found that the trial court had no sua sponte duty to instruct on the natural and probable consequences doctrine. (Id. at pp. 484-485.) The Gonzalez majority noted that the sua sponte duty set forth in Prettyman only applied when the prosecution was relying on the natural and probable consequences doctrine. (Ibid.) However, in our view, there is a difference between a situation in which the prosecution is proving a defendant's guilt as an accomplice and one in which the prosecution is offering an accomplice as a witness to prove a defendant's guilt. In the latter situation, the prosecution cannot ever be said to rely on a particular theory of accomplice liability. Instead, the defendant is entitled to have the jury instructed on all potential theories of accomplice liability because under any one of them the witness would require corroboration. What is essential is that the prosecution is relying upon the testimony of the potential accomplice to prove the defendant guilty. To that extent, we agree with the concurring opinion in Gonzalez: The trial court is required, in fulfilling its sua sponte duty to instruct on the law of accomplices and the requirement that accomplice testimony be corroborated, to instruct on both theories of accomplice liability if the evidence would support a finding under both. (See id. at pp. 486-487 (conc. opn. of Mosk, J.).)
Here, whether there is a sua sponte duty to instruct is not dispositive, because defendant's trial counsel did ask that the trial court instruct the jury on the natural and probable consequences doctrine, and the trial court declined to do so. On the same basis, we reject the Attorney General's contention that the trial court need not elaborate on the general principles of accomplice liability absent a request. Here, there was a request.
(8) When a defendant requests an instruction that is legally correct and supported by the evidence, the trial court generally must give an instruction that covers the point requested by the defendant (see §§ 1093, subd. (f), 1127; People v. Marshall (1997) 15 Cal.4th 1, 39 [61 Cal.Rptr.2d 84, 931 P.2d 262]), although the trial court may modify or replace a proposed instruction if the modifications are themselves correct and pertinent to the issues. (People v. Dieguez (2001) 89 Cal.App.4th 266, 277 [107 Cal.Rptr.2d 160].) Here, there was sufficient evidence to submit to the jury the question of whether the witnesses were accomplices under the natural and probable consequences doctrine, and the Attorney General does not contend otherwise. (See Prettyman, supra, 14 Cal.4th at p. 269.) According to their own testimony, the three witnesses were present with defendant at the scene of the shooting and left with him in Giddings's van. Giddings drove to and from the scene of the shooting, and Anwar confronted and tried to punch Sanchez before the *989 shooting started. All three witnesses were originally charged with the crime of shooting at an occupied motor vehicle (one of the charges on which defendant was tried), and they pled guilty or no contest to aiding and abetting an assault with a semiautomatic firearm. Giddings and Robles had been with defendant a few days earlier on Meekland when he shot at a perceived Sureno, which would have been relevant to the jury's determination of whether defendant's actions were foreseeable. Moreover, Michael Roemer, the prosecutor who decided which charges to bring and negotiated the plea agreements with the three witnesses, testified that he believed he could have charged them with murder, either on an aiding and abetting theory or on a conspiracy theory. The record thus contained substantial evidence that the witnesses aided and abetted a target offense, and the jury could reasonably have found that the crimes charged against defendant were natural and probable consequences of the target offense. (See Prettyman, supra, 14 Cal.4th at p. 269 [evidentiary showing justifying instruction on natural and probable consequences doctrine].)
Thus, we find the court's failure to instruct on the natural and probable consequences doctrine and the relevant target crimes was error.[11] The question remains whether that error was harmful under the appropriate standard of review.
(9) A failure to instruct on accomplice testimony is harmless if there is sufficient corroborating evidence in the record. (People v. Frye, supra, 18 Cal.4th at p. 966; People v. Miranda (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127], disapproved on another point in People v. Marshall (1990) 50 Cal.3d 907, 933, fn. 4 [269 Cal.Rptr. 269, 790 P.2d 676].) The requisite corroboration must connect the defendant with the commission of the offense, rather than simply showing that the offense occurred. (§ 1111.) However, the corroborating evidence need not corroborate every fact to which the accomplice testified or establish every element of the crime charged, but is sufficient if it "tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (Fauber, supra, 2 Cal.4th at pp. 834-835; Garrison, supra, 47 Cal.3d at p. 772.) The corroborating evidence "`may be slight and entitled to little consideration when standing alone ...' [citations]" (Tewksbury, supra, 15 Cal.3d at p. 969), and may consist of circumstantial evidence. (Garrison, *990 supra, 47 Cal.3d at p. 773.) Corroboration must come from a source other than another accomplice. (Tewksbury, supra, 15 Cal.3d at p. 958.)
Here, there is sufficient corroborating evidence connecting defendant with commission of the charged crimes. Manuel Robles's sister, Anna Robles Ramirez, testified that at around 2:30 p.m. on September 16, 2003 (about one-half hour before the shooting), defendant was seated in the front passenger seat of Giddings's van as Giddings drove the van away from Anna's mother's home. Several witnesses, including Stephanie Koller, Kyle Koller, and Ranil Bhukhan, confirmed that Giddings's van was at the scene of the shooting, which Stephanie Koller testified occurred shortly after 3:00 p.m. Kyle Koller testified that the shots were fired by a man seated in the front passenger seat of the van. This evidence connects defendant to the shooting and corroborates the testimony of the codefendants that defendant was in the van, sat in the front passenger seat, and fired the shots.
Other testimony provides additional corroboration of defendant's involvement in the crimes. Lieutenant Perry testified that, when the police stopped the van later in the afternoon, defendant was in the van (although he was no longer seated in the front passenger seat). The parties stipulated at trial that Osvaldo Ramirez had testified at the preliminary hearing that defendant was one of the men he saw in the van.[12] Finally, when police searched defendant's apartment the day after the shooting, they found an empty box of Winchester brand nine-millimeter Luger ammunition. The shell casings recovered at the scene of the shooting were nine-millimeter Luger casings, some of which were Winchester brand casings.
Because the record contains sufficient evidence corroborating the testimony of the codefendants and connecting defendant to the charged crimes, the trial court's error in failing to instruct the jury on the natural and probable consequences doctrine as part of its instructions on accomplice testimony was harmless.

C. Expert Testimony[*]

*991 III. DISPOSITION

The judgment is affirmed.
Jones, P. J., and Needham, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A. and part II.C.
[*] Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] All further statutory references are to the Penal Code unless otherwise specified.
[2] Giddings pled no contest; Robles and Anwar pled guilty. Each of them also admitted that the assault was committed for the benefit of a criminal street gang.
[3] At the close of evidence at trial, the prosecutor struck certain portions of the firearm and bodily injury allegations. These modifications are not relevant on this appeal.
[*] See footnote, ante, page 972.
[8] Defendant notes that perpetrators, as well as aiders and abettors, are accomplices within the meaning of section 1111. However, there was, of course, no basis for instructing the jury as a matter of law that any of the three witnesses was the perpetrator, as all three of them testified that defendant committed the shooting.
[9] Robles testified that he had seen a gun in defendant's pocket earlier in the day, and that he was not "surprised" by defendant's actions in light of the shooting on Meekland a few days earlier. However, Robles's lack of surprise does not dictate a conclusion that he knew of defendant's purpose to commit the charged crimes or intended to assist in their commission.
[10] In Prettyman, the prosecution did not rely upon the natural and probable consequences doctrine; however, the trial court on its own initiative instructed on that theory. (Prettyman, supra, 14 Cal.4th at pp. 269-270.) Having done so, the court was also obliged to identify and instruct the jury on the relevant target offenses. (Id. at p. 270.)
[11] In concluding that the court was required to instruct on the natural and probable consequences doctrine, we do not hold that the court was required to instruct the jury using the precise wording of defendant's proposed instruction on that issue, and we do not address whether that particular instruction was appropriate in all respects. As noted above, a trial court may make appropriate modifications to a proposed instruction, or replace it with a different instruction that correctly covers the issues. (People v. Dieguez, supra, 89 Cal.App.4th at p. 277.)
[12] The parties stipulated that Ramirez had testified that Robles was seated in the front passenger seat, Giddings was the driver, and defendant was in the back of the van and got out and threw a punch at Sanchez. The parties further stipulated that Ramirez had testified that he might have mixed up the locations of the men he saw in the van.
[*] See footnote, ante, page 972.